[No. 37843.   En Banc.   November 24, 1965.]

THE STATE OF WASHINGTON, *Respondent,* v. CLARENCE JONES, *Appellant.**

*Peterson, Taylor & Day,* for appellant.

*Clarence J. Rabideau* and *Arthur Hansen,* for respondent.

HALE, J.—There was civic turmoil in Pasco on the peaceful banks of the Columbia. A number of law enforce-

*Reported in 408 P.2d 247.

ment officials said that gambling and other forms of vice flourished in East Pasco; other officials expressed disbelief. The Attorney General, on request, dispatched investigators. They caused the arrest of Clarence Jones for suffering gambling apparatus—a deck of cards—to be kept in a building occupied by him. Mr. Jones said that he was a cook, and only a cook; that his arrest must have been an afterthought because, when the officers were taking other miscreants off to jail, one of them merely said "take cookie, too," and he was thereupon led off to jail with the others. Meanwhile, the Columbia rolled serenely on to the sea.

By information, the prosecuting attorney of Franklin County in count 1, reciting RCW 9.87.010, charged Clarence Jones with vagrancy on August 31, 1963, as a common gambler in a place where gambling was conducted or gambling devices kept. Count 2 refers to RCW 9.47.030 and charges the defendant with possession of gambling devices on August 31, 1963, by permitting them in a building occupied by him. Thus, the information lays two separate and distinct charges against the defendant: (1) vagrancy, and (2) possession of gambling devices.

Both parties agree that at trial the state moved for dismissal of count 1, the charge of vagrancy, which request the court granted, although we find no motion or ruling thereon. From a verdict of guilty entered on count 2, the possession of gambling devices, the defendant appeals.

Before discussing the issues raised by this appeal, we point out several errors in the record which apparently escaped the parties' notice. The state and defendant acknowledge that count 1, the vagrancy charge brought under RCW 9.87.010, was dismissed, yet the judgment and sentence from which the defendant appeals recites, first, that he was informed by the court that the information charged him with "vagrancy (R.C.W. 9.87.010);" that he was duly convicted of the crime of "Vagrancy (R.C.W. 9.87.010) Count 1; " and that he was adjudged guilty of the crime of "Vagrancy (R.C.W. 9.87.010) Count 1." The warrant of commitment directing the sheriff to execute the sentence by confining the defendant for 180 days likewise recites

that the defendant has been duly convicted of the crime of "Vagrancy (R.C.W. 9.87.010) Count 1." These errors should be corrected to make the judgment and sentence conform to the proceedings.

The defendant pleaded not guilty to count 2, charging violation of RCW 9.47.030, the statute reading:

> Every person who shall have in his possession or shall permit to be placed or kept in any building or boat, or part thereof, owned, leased or *occupied* by him, any table, slot machine, or any other article, device or apparatus of a kind commonly used for gambling, or operated for the losing or winning of any money or property, or any representative of either, upon any chance or uncertain or contingent event, shall be guilty of a gross misdemeanor. (Italics ours.)

Chief among the points raised by appellant's assignments of error is whether the evidence sufficiently proved a crime denounced by the statute. Appellant argues from the evidence that he was and is a cook by occupation; that he had never been convicted of a crime or had any run-ins with the law; and that he had been working as a cook for weekly wages at Bobbie & Ray's Cafe in East Pasco for about 2 months when the place was raided by the sheriff's deputies and Attorney General's investigators. On verbal direction from C. O. Rolfson, one of the investigators, to "take cookie, too," he found himself in jail facing charges of vagrancy and complicity in gambling.

Mr. Jones testified that he had no partnership in, rights to profits from, or ownership concerning operation of Bobbie & Ray's Cafe, and that the cafe was operated, controlled and owned by his employer, Ray Walker. He said no one ever asked his permission to gamble on the premises, and if any gambling took place he was not privy to it. He was, he said, exclusively a cook—opening the cafe at 4 p.m. each day and keeping it open for business as only a cafe until approximately 2 a.m.

Did the state submit sufficient proof prima facie in its case in chief that Mr. Jones permitted a gambling device, or apparatus used commonly for gambling, to be placed

or kept in any building owned, leased, or occupied by him? To test sufficiency of the evidence, we limit it to the following evidence, and omit conversations taking place at the jail following defendant's arrest.

The state called Mr. Ken Latcholia who identified himself as an investigator from the State Attorney General's office. He testified that on August 31, 1963, when he entered Bobbie & Ray's Cafe in East Pasco, he observed Mr. Jones to his left behind the counter serving coffee. He said that, as one walks into the cafe, the food service counter stands to the left while across from it and to the right are several booths and a jukebox. Toward the rear of the main room is another room with several booths against the wall. A blanket had been spread on the table in one of the booths in the rear room and on it were cards and money. Mr. Latcholia said that a Mr. Traylor, seated in the booth, asked him to play blackjack. He agreed, and the game started at 25 cents a hand, but they soon raised the stakes to 50 cents. Mr. Latcholia said that he played blackjack with Traylor for 25 or 30 minutes—long enough to lose $10 to him.

During the blackjack game, a Mr. Treglown, likewise an investigator from the Attorney General's office, stood by and observed. While watching the play, Mr. Latcholia heard Mr. Treglown order a cup of coffee from Mr. Jones and saw the latter serve the coffee at the booth adjacent to the one in which the game was in progress.

John Treglown corroborated Latcholia's account. He said that he entered Bobbie & Ray's Cafe with Mr. Latcholia, his fellow investigator, and that he watched the card game involving Traylor and Latcholia. He said that, while the card game went on, "the defendant was serving food in the establishment, and was walking back and forth and generally running the establishment. He appeared to be the man in charge of the establishment." He said that, when he and Latcholia entered and walked toward the back booth, he observed a card game in progress on the blanketed table between Traylor and another individual. Treglown related that, when Traylor invited Latcholia to play blackjack, the other fellow left the table and Latcholia sat down

at it and began to play blackjack with Traylor. On the blanket he noticed some dollar bills, quarters, smaller change and, as he expressed it, quite a stack of 50 cent pieces.

Treglown said that several times during the game the defendant went to the refrigerator just across the aisle from where the card game was in progress, and on one of these trips to the refrigerator he ordered a cup of coffee from defendant. He said that defendant served the coffee in the booth adjacent to the card game, and that the game was in the direct sight of the defendant on each of his trips to the refrigerator and when serving him the coffee.

Mr. C. O. Rolfson, chief investigator for the Attorney General's office, said that he entered Bobbie & Ray's Cafe during the early morning hours of September 1, 1963, when the place was raided. He saw defendant Jones standing behind the counter. When Mr. Traylor was arrested and searched outside the cafe by one of the officers, Mr. Rolfson noted that a deck of cards was found in Traylor's coat pocket. He said that he thereupon went into the cafe and directed the officers to place Mr. Jones under arrest. He recalled that among the persons arrested was one Ray Walker who had the premises under lease and had his living quarters in the rear of the building.

At the conclusion of the state's evidence, the defendant moved for a dismissal on the ground that the evidence failed to show defendant had any connection with any gambling devices or could be deemed to *occupy* the premises where a gambling device or apparatus was kept for use.

Surprisingly little authority exists to aid us in determining what the legislature meant by the phrase *occupied by him* as employed in RCW 9.47.030. Limiting our discussion to the foregoing evidence offered by the state to prove occupancy, we note several facts discernible to the jury from which occupancy by the defendant could have been inferred.

Mr. Jones was the only person on the premises apparently engaged in working there; he wore the uniform of and engaged in the actions of a cook; he moved about the entire visible premises serving food to the patrons; no

other persons were present to participate in providing food or drink for any of the patrons. He appeared to be in charge of the premises, accepting payment from the customers for food and drink served by him, and apparently was the only person on the premises to whom a customer could look for service. Consequently, from this evidence, the jury could find that defendant was in charge of and exercised control or dominion over the premises.

Thus, as to all persons classified by law as business invitees on the premises, defendant Jones, under this evidence, should be deemed the person in charge. His would be the decision whether business invitees were to be served or removed from the premises for misbehavior. Apparently he had the premises and the business enterprise under his immediate control and supervision, and appeared to have responsibilities and authority much broader in nature than those pertaining exclusively to his job as a cook.

The jury could have found also from this evidence that Mr. Jones knew of the gambling game and observed that it was being carried on by means of a deck of cards, and that, had he chosen to exercise his authority over the premises, he could have caused the eviction of Mr. Traylor and his deck of cards. Having not exercised this seeming authority, the jury was at liberty to conclude that, in countenancing the blackjack game on business premises under his control, the defendant permitted the cards to be placed and kept on premises occupied by him, and, having seen the cards used in the blackjack game, was aware that they constituted an article or device used in gambling.

■ If no ownership, leasehold interest, tenancy or profit-sharing scheme is shown, more is required to be proved than mere physical occupancy or employment on the premises before it can be said that one has *occupied* them under the possession of gambling devices statute, RCW 9.47.030. In the absence of proof of leasehold interest, ownership, tenancy or profit sharing, proof must be made not only that one was physically present with the consent of the party entitled to possession but also that he had sufficient control over the premises and the activities taking

place therein, or authority in supervising or conducting the enterprise therein, to deny service to customers or patrons where their misbehavior would warrant such denial. From the evidence described, the jury could infer that the defendant had such control and supervision and that the defendant *occupied* the premises within the meaning of RCW 9.47.030.

One final point merits discussion.

In the jury's absence, defendant, in the form of an offer of proof, requested leave to cross-examine the state's witnesses

> on the question of why the Attorney General's officers were in Pasco for several months conducting an investigation; if they were conducting an investigation; at whose request and why?

to elicit that the

> investigation was not to investigate crime nor to arrest these defendants, but was for the purpose of investigating whether there were payoffs to Pasco police officers; and that these arrests and the raid were made for the purpose of getting these people into custody so as to make it possible to interrogate them.

He assigns error to the court's refusal to allow cross-examination in accordance with these declared intentions.

Although the law allows cross-examination into matters which will affect the credibility of a witness by showing bias, ill will, interest or corruption (3 Wigmore on Evidence, § 943 *et seq.* (3d ed. 1940)), the evidence sought to be elicited must be material and relevant to the matters sought to be proved and specific enough to be free from vagueness; otherwise, all manner of argumentative and speculative evidence will be adduced. Defendant's offer of proof referring to no specific acts, conduct or statements on the part of the witness, but vaguely tending to show bias in the most indefinite and speculative way, appears too remote to meet the purpose for which it was offered, and the trial court properly held it to be immaterial and irrelevant (*Dods v. Harrison*, 51 Wn.2d 446, 319 P.2d 558 (1957)); the proffered evidence seems

to fall within the established rule that a witness cannot be impeached on matters collateral to the principal issues being tried. *State v. Oswalt,* 62 Wn.2d 118, 381 P.2d 617 (1963). Scope of cross-examination rests largely in the discretion of the trial court. *Good v. West Seattle General Hospital Corp.,* 53 Wn.2d 617, 335 P.2d 590 (1959). We see no abuse in the trial court's exercise of its discretion by denying cross-examination concerning the subjects offered for the purposes mentioned.

The remaining assignments of error appearing to be without merit do not warrant discussion and, therefore, we affirm the judgment and sentence and remand the cause to the trial court for correction of the recitals previously mentioned.

These recitals being formal and apparently not affecting the validity of the judgment and sentence may, on notice to the defendant, be corrected by the trial court without its vacating the judgment and sentence. Authority to correct clerical or formal errors in a judgment and sentence follows from our opinions in *State v. Williams,* 51 Wn.2d 182, 316 P.2d 913 (1957), where we remanded for correction of a sentence greater than the maximum fixed by statute, and in *In re McNutt v. Delmore,* 47 Wn.2d 563, 288 P.2d 848 (1955), in which we allowed an obvious error to be corrected by increasing the term of imprisonment from 10 years to 20 years on an habitual criminal conviction. Any questions stemming from our decision in *State ex rel. Sharf v. Municipal Court of Seattle,* 56 Wn.2d 589, 354 P.2d 692 (1960), concerning correction of serious errors in criminal judgments, would not, we think, apply to the purely formal errors appearing in the instant judgment and sentence.

Affirmed and remanded for correction of judgment and sentence.

Hill, Finley, Ott, Hunter, and Hamilton, JJ., concur.

Rosellini, C. J., Donworth and Weaver, JJ., concur in the result.