26 P.3d 308 (2001)
107 Wash.App. 160
STATE of Washington, Respondent,
v.
Mark Patrick KILGORE, Appellant.
No. 24200-1-II.
Court of Appeals of Washington, Division 2.
July 10, 2001.
*311 Sean P. Wickens, Law Offices of Sverre O. Staurset P.S, Tacoma (Court Appointed), for Appellant.
Barbara L. Corey-Boulet, Pierce County Deputy Pros Atty, for Respondent. *309
*310 HOUGHTON, J.
Mark Patrick Kilgore appeals from his conviction of three counts of child rape and four counts of child molestation, arguing that the trial court committed various evidentiary errors. We reverse one count of child rape and one count of child molestation, affirm the other five counts, and remand for further proceedings.

FACTS
In 1993, Kilgore moved to Washington with his wife, Nicolette, his stepdaughter, A.B., and their son, Bradley. Soon after their arrival, Bradley was diagnosed with brain cancer, which meant that Nicolette had to spend many nights away from home at the hospital with Bradley. RP 930, 1374. While Nicolette was away, A.B. said Kilgore molested and raped her, both vaginally and anally. These incidents comprise Counts IV (first degree child rape), V (first degree child rape), and VI (first degree child molestation).
In spring 1995, Kilgore's two brothers-in-law, D.O. (age 10) and T.O. (age 8), came to live with the Kilgores. They testified that while they were living there, Kilgore got them drunk and on separate occasions, molested them. These incidents comprise Counts III (first degree child molestation against D.O.) and VII (first degree child molestation against T.O.).
Kilgore and Nicolette separated in the fall 1995. During summer 1996, Kilgore spent time at the house of his half-sister, Cheryl M. On June 28, 1996, Kilgore cared for his step-niece, C.M., while Cheryl and Jay M., C.M.'s father, were out celebrating Cheryl's birthday. C.M. said that while they were gone, Kilgore molested her. Then on July 4, 1996, Kilgore took C.M. to the home of a patient Kilgore cared for, where C.M. said Kilgore raped her. These incidents comprise Counts I (first degree child molestation) and II (first degree child rape).

A.B.
Evidence of Kilgore's rapes and molestation of A.B. came from A.B.'s testimony and through Nicolette's and Caryn Bujnowski's testimonies repeating A.B.'s hearsay statements. A.B. testified that Kilgore had rubbed her front and back lower private parts with his hand on her skin six or seven times. She testified that she did not remember if his hand went inside her. She told him to stop but he would not. These incidents took place on Kilgore's bed while Nicolette was at the hospital with Bradley. A.B. testified that she did not tell her mother immediately *312 because she was afraid Kilgore would hurt her mother. A.B. also testified that Kilgore had given her, T.O., and D.O. beer to drink. During cross and re-direct examinations, defense counsel and the prosecutor asked her about statements she had given about the incident.
Nicolette explained that Kilgore frequently cared for A.B. while she was at the hospital with their son. She testified that after T.O. and D.O. had come forward with allegations against Kilgore, A.B. came forward and told Nicolette that Kilgore had also touched her. A.B. described incidents of his rubbing her private parts and her touching his. She also described one incident where Kilgore had gotten her, T.O., and D.O. drunk, encouraged her to strip, and had T.O. and D.O. look at her vagina. Finally, A.B. told Nicolette about how Kilgore had raped her and about how it hurt. A.B. said that she wished Nicolette had let her go to the hospital with Bradley.
Nicolette described another incident that provided circumstantial corroboration of A.B.'s charges. Once she came home unexpectedly early from the hospital and found all of the children and Kilgore dancing and drinking beer. Another time, while in a card shop at a mall, A.B. wandered into an "adult" section, got Nicolette's attention, pointed to some massage oil, and said that was the oil Kilgore had used on her.
Finally, Nicolette testified about some of Kilgore's actions that were corroborating evidence. After allegations had been raised against Kilgore involving D.O. and T.O., Nicolette testified about how Kilgore started to behave overly nicely toward A.B. and bought her extravagant gifts. Nicolette also testified about a telephone conversation where Kilgore admitted, "You know, maybe this really did happen. Maybe I was dreaming, or maybe it was in my sleep, maybe it was subconscious." Report of Proceedings at 958. This statement took Nicolette by surprise so she had Kilgore repeat it to Cheryl M.
The final witness who testified about A.B.'s statements was Caryn Bujnowski, a forensic investigator with the prosecutor's office. Bujnowski testified in detail about A.B.'s description of how Kilgore had molested and raped her. Kilgore began by giving A.B. massages with oil and kissing her. He then would rub her on her naked private parts. He also made her touch his penis and play with it. Finally, he penetrated her both vaginally and anally on several occasions. During these incidents, "stuff" would "squirt" out of his penis. Report of Proceedings at 1097-1100.
After A.B. had testified, the prosecutor came forward and told the court that A.B.'s grandmother, Lynn B., had told him about a conversation she had had with A.B. The prosecutor said that Lynn B. told him that in this conversation, A.B. had told her that she was scared and did not want to testify. The prosecutor said Lynn B. told him she had then asked A.B. if she was making anything up, and A.B. stated that maybe she was. But later, Lynn B. testified under oath about the incident and explained that A.B. had never said she was making anything up; instead Lynn B. testified that she told the prosecutor she was worried about A.B. telling stories because A.B. could not remember all of what happened. The prosecutor also had A.B. interviewed after Lynn B. told him about this alleged incident, and A.B. assured the interviewer that she had not made up the allegations or told Lynn B. that she had.
Defense counsel, however, asked the court to make A.B. available for a new interview. He requested the trial court to order a new interview because he did not want to call A.B. as a witness and have her cry in front of the jury. The prosecutor opposed this, arguing that Lynn B.'s testimony showed that A.B. had never said she made anything up and that requiring her to return to the courthouse would be traumatic. The trial court did not allow defense counsel to re-interview A.B.

D.O. & T.O.
At trial, D.O. testified about how Kilgore had molested him. Kilgore plied D.O. with Olde English malt liquor while Nicolette was at the hospital and then convinced D.O. to sleep with him in his and Nicolette's bed. D.O. was not suspicious because he liked his *313 brother-in-law. But in the early morning hours, D.O. awakened when Kilgore reached down D.O.'s sweatpants and fondled D.O.'s penis. D.O. pretended to wake up, got out of bed, and left. D.O. testified that Kilgore later explained that he did not like what he had done, but he had had a nightmare. D.O. also described a second incident where Kilgore had gotten him drunk and molested him.
T.O. testified to a similar incident. He had also gotten drunk and slept in Kilgore's bed, only to awake with Kilgore touching his penis. This incident occurred before the incident with D.O. Bujnowski testified that T.O. had made similar statements to her.

C.M.
C.M., who was 10 years old, moved to Washington to live with her father, Jay M., and his wife, Cheryl M., in 1996. During that summer, Kilgore, spent time at the M.'s. On June 28, 1996, Cheryl's birthday, Kilgore arranged to baby-sit C.M. by encouraging Jay to take Cheryl out; Kilgore even made the dinner reservations for Jay. C.M. testified that while her parents were out on that date, Kilgore turned off all the lights, lit candles, and sat on the couch next to her. He then started to kiss her and rub her private parts. She tried to get up, but he held her down. His hand went under her clothes and moved around on her genitalia.
On July 4, 1996, Kilgore took C.M. to the house of a patient he cared for. While there, C.M. went to a spare bedroom to rest. C.M. testified that Kilgore came in, closed the door, took off his clothes, took off her clothes, and raped her. C.M. tried to stop him but could not. C.M. also related a third incident of molestation and said that Kilgore had done it lots of other times.
C.M. finally told her mother, Sharon M., about the rapes while she was visiting her mother in August 1996. C.M. explained that she did not immediately report the abuse because she was afraid that her father would kill Kilgore.
Circumstantial evidence supported parts of C.M.'s testimony. Cheryl remembered coming home from her birthday dinner to find all the lights out and candles lit. When she and Jay came through the door, they were greeted by C.M., acting very strangely, and Kilgore looming behind her. Cheryl also testified about an incident when Kilgore asked to take C.M. out. When they returned, C.M. was wearing a ring, a silky low-cut black dress, and high heels. Kilgore explained that he had bought the items for C.M. because she had a crush on him. Finally, Cheryl testified that Kilgore had once stated in a conversation with his wife, which Cheryl overheard, that "he possibly could have done this." Report of Proceedings at 609.
The State also presented testimony from Joyce Epstein-Ross, a nurse practitioner, who had examined C.M. To help with her diagnosis, Epstein-Ross took C.M.'s sexual history. To lay a foundation for the admission of C.M.'s statements to Epstein-Ross, the State called Epstein-Ross to testify about the interview. Epstein-Ross testified that she asked C.M. if she knew why she was there, and C.M. responded that she was there because Kilgore had molested her. Next, Epstein-Ross explained to C.M. that she was going to look at C.M.'s body to make sure it was healthy. Epstein-Ross then asked if C.M. had any questions about her body, and C.M. responded with questions about a burning sensation she had when she urinated. At trial, Epstein-Ross did not testify to these foundational questions or about C.M.'s sexual history. Instead, she testified that her observations of C.M.'s hymen were "worrisome,"[1] that these findings were consistent with what C.M. had told her, and that she could not say that any of Kilgore's conduct caused this finding.
Before trial, the defendant moved to suppress Epstein-Ross's testimony about C.M.'s statements. Specifically, Kilgore argued that the medical diagnosis hearsay exception did not apply "because the foundational requirements *314 were not met[.]" Report of Proceedings at 11. Later, Kilgore raised the issue again, stating, "[T]he Defense would be arguing the lines of Carol M.D.[2] that the testimony would be inadmissible under that hearsay exception." Report of Proceedings at 282. The trial court found that the medical-diagnosis exception was firmly rooted and admitted the testimony.
The State also moved to suppress C.M.'s history of prior sexual abuse. The State acknowledged that two or three others had been convicted of abusing C.M., but it argued that this evidence was not admissible unless the defense could show it was relevant. Kilgore argued the evidence was relevant because C.M. had been told to report such abuse immediately and had in fact done so in the past, but this time she did not. He also argued it was relevant because a social worker in Minnesota had not believed C.M.'s accusations because he thought children who had been abused in the past often suffered from a "cry wolf syndrome". Report of Proceedings at 326. The trial court reserved ruling so the parties could brief the issue.
On re-argument, Kilgore asserted that the evidence was admissible to rebut the inference that C.M. gained precocious sexual knowledge from his abuse of her and to rebut the inference that his actions led to Epstein-Ross's "worrisome" diagnosis. Report of Proceedings at 355. The State responded that it was not going to argue that C.M. had any precocious sexual knowledge or that this knowledge was evidence of guilt. The State also explained that it would not be suggesting that Kilgore's penetration caused the findings in Epstein-Ross's diagnosis. The court granted the State's motion to suppress, but it ruled that Epstein-Ross could not connect her findings to the defendant; the court allowed Kilgore to raise this issue again when Epstein-Ross testified. Kilgore raised this issue again and made an offer of proof that a person had confessed to digitally penetrating C.M. in December 1995.

ER 404(b) Evidence
Before trial, Kilgore moved to suppress evidence of acts of sexual misconduct with the children that were not charged. Kilgore argued that because the court must find by a preponderance of the evidence that the prior bad acts occurred, "We are going to have to call in every one of those witnesses [who will testify about prior bad acts] and defense [sic] is suppose to be afforded the opportunity then to present testimony in opposition to that. And without that, the Court cannot admit that evidence of other crimes, wrongs or acts." Report of Proceedings at 192. Kilgore did not make an offer of proof about what evidence he would present or ask to testify about at the proposed evidentiary hearing.
Rather than hold an evidentiary hearing, the trial court allowed the prosecutor to make an offer of proof. In this offer of proof, the prosecutor said C.M. would testify about a second incident of molestation, A.B. would testify about at least one other incident of molestation, and D.O. would testify about a second incident of molestation.[3] The prosecutor also discussed an incident where Kilgore had shown A.B. pornographic videotapes. These were admissible, the prosecutor argued, because they showed evidence of lustful disposition. The court then balanced the probative value of the evidence against its prejudicial affect and ruled that the incidents were admissible to show motive, opportunity, and lustful disposition.

Bias of Lynn B.
The State moved to exclude evidence that Lynn B., Kilgore's mother-in-law, had been arrested for shoplifting and convicted of driving under the influence (DUI). Kilgore argued that these incidents were admissible because Lynn B. was the instigator of all of *315 the allegations and these incidents had caused "bad blood" between her and Kilgore. The DUI incident was relevant, he argued, because after the arrest, he had told Lynn B. that he did not want his children riding in the car with her because of her drinking. At first, the trial court reserved its ruling. When the issue was raised again, the State argued that Kilgore had failed to make the connection between the incidents and coaching of the children. The trial court agreed that Kilgore had not shown the link between the incidents and granted the State's motion.

Defendant's Case
Kilgore denied all sexual contact with the children. He denied that he had ever bought C.M. a dress. He denied that C.M. was still up the night that the M.s came home and he had the candles lit. He denied that he ever gave D.O. or T.O. any beer or that he ever drank Olde English malt liquor, but he admitted giving A.B. an occasional sip of beer.
Kilgore testified at length about a dispute he had with Lynn B. over claiming D.O. and T.O. on his 1995 tax forms. Lynn B. apparently had been collecting welfare for the boys while they lived with Kilgore. Kilgore said that he threatened to turn her in if she did not give him the boys' social security numbers. He then noted that it was soon after that threat when he learned of D.O.'s and T.O.'s accusations.
A jury convicted Kilgore of Counts I and II (first degree child molestation and rape of C.M.), III (first degree child molestation against D.O.), IV, V and VI (first degree child rape and molestation against A.B.), and Count VII (first degree child molestation against T.O.). Kilgore appeals.

ANALYSIS

Right of Confrontation
Kilgore first contends that because A.B. testified that she did not remember Kilgore touching her "inside," she did not testify in a manner sufficient to satisfy the confrontation clause and the trial court erred in admitting her statements under RCW 9A.44.120, the child hearsay exception.[4] Br. of Appellant 33.
To satisfy the confrontation clause when admitting hearsay statements under RCW 9A.44.120 when the child is available to testify, the child must take the stand and either (1) testify about the abuse[5] or (2) if the child has recanted or does not remember the events described in the hearsay statement, the State must ask the child about the events and hearsay statements and the defendant must have an opportunity to cross-examine the child about the statements. State v. Clark, 139 Wash.2d 152, 159, 985 P.2d 377 (1999).[6]
Here, the prosecutor asked A.B. about the incidents of abuse and A.B. testified about *316 how Kilgore had touched her private parts on her bare skin, but she did not remember whether he had penetrated her. She also testified about, and Kilgore was able to cross-examine her about the statements she made to Bujnowski and her mother about the rapes. Thus, Kilgore had a full opportunity to cross-examine A.B. about the alleged sexual abuse and her statements and, under the standards in Rohrich and Clark, A.B. testified as required by the confrontation clause. Thus, Kilgore's argument fails.

Refusal to Allow Kilgore to Re-interview A.B.
Kilgore next contends that the trial court erred when it refused to allow him to re-interview A.B. after the prosecutor reported that A.B. had told Lynn B. that maybe she made up her testimony. As a preliminary matter, the State asserts that Kilgore waived this issue by not citing any relevant authority. See RAP 10.3; State v. Farmer, 116 Wash.2d 414, 433, 805 P.2d 200, 812 P.2d 858 (1991) (requiring citation to authority). Kilgore responds by noting that he cited one case, State v. Guloy, 104 Wash.2d 412, 705 P.2d 1182 (1985), cert. denied, 475 U.S. 1020, 106 S.Ct. 1208, 89 L.Ed.2d 321 (1986).
The State is correct that Kilgore cites no relevant legal authority. In his opening brief, Kilgore states, "The Washington Supreme Court has held that preventing a defendant from fully and effectively cross-examining a State witness, is a violation of the defendant's constitutional rights under the [c]onfrontation [c]lause. State v. Guloy, 104 Wash.2d 412, 705 P.2d 1182 (1985)." Br. of Appellant 50. But at trial, defense counsel specifically stated, "I am certainly not interested in this little girl getting up there and crying her eyes out in front of the jury. That does it no good. But ... we still need the opportunity to interview her." Report of Proceedings at 1177. Defense counsel never asked to subpoena A.B. to testify.
Here, because defense counsel specifically stated that he did not want to put A.B. on the stand, it is not a case where Kilgore was denied his right to confront A.B.; rather, the trial court's decision not to allow Kilgore to re-interview A.B. is at most a discovery violation. Thus, the only case Kilgore cites is not on point. The purpose of RAP 10.3's requirement that parties cite authority is "to enable the court and opposing counsel efficiently and expeditiously to review the accuracy ... [and] the relevant legal authority." Litho Color, Inc. v. Pac. Employers Ins. Co., 98 Wash.App. 286, 305-06, 991 P.2d 638 (1999). Kilgore's citation to irrelevant legal authority does not satisfy that purpose or RAP 10.3. Nevertheless, we review this issue under RAP 1.2(c).[7]
Under CrR 4.7(d),[8] the trial court may subpoena information held by third persons if that evidence would be discoverable in the hands of the prosecution. Under CrR 4.7(a)(3),[9] the prosecutor must turn over all evidence it possesses that tends to negate guilt. Thus, if A.B.'s testimony negated guilt, the trial court should have subpoenaed A.B. so Kilgore could interview her.
The trial court did not abuse its discretion when it refused to allow Kilgore to re-interview A.B. See State v. Hoffman, 116 Wash.2d 51, 80, 804 P.2d 577 (1991) (holding that the scope of discovery is within the discretion of the trial court). The record does not support a conclusion that the trial *317 court acted unreasonably when it found that A.B.'s testimony would not negate guilt. The prosecutor informed the court that Lynn B. had told him that A.B. said she might have made up her testimony. But Lynn B. testified under oath that she never said that to the prosecutor and that A.B. never told her she made anything up. Lynn B. explained that she told the prosecutor she was afraid A.B. might make up testimony because A.B. was not remembering everything, but the prosecutor might have misunderstood and thought she said that A.B. had said she was making up her testimony. Moreover, the prosecutor informed the court that A.B. had denied ever telling Lynn B. that she made up any testimony. Thus, the issue of whether A.B. ever told Lynn B. that she was making up testimony was an issue of fact.
If Lynn B. had testified that A.B. commented as the prosecutor disclosed, and then A.B. later denied saying it, the result might be different. But instead, the trial court was faced with an issue of credibility between what the prosecutor said Lynn B. told him and what Lynn B. testified that she told him. When serving as the finder of fact, the trial court decides issues of fact and makes credibility determinations. State v. Camarillo, 115 Wash.2d 60, 71, 794 P.2d 850 (1990). Once it found Lynn B.'s testimony credible about what she told the prosecutor, the trial court had the discretion to control the scope of discovery and to refuse to allow defense counsel to re-interview A.B. The trial court did not abuse its discretion, and Kilgore's argument fails.

Suppression of C.M.'s Prior Abuse
Kilgore further contends that the trial court erred in suppressing evidence that someone else had previously abused C.M. He claims the evidence was relevant to explain an alternative source for Epstein-Ross's "worrisome" finding and to rebut the inference that C.M. gained her sexual knowledge from Kilgore's abuse.
Courts should not use Washington's Rape Shield law to exclude evidence that an alleged child victim had previously been abused. State v. Carver, 37 Wash.App. 122, 124, 678 P.2d 842, review denied, 101 Wash.2d 1019 (1984). Instead, courts should use the general evidentiary principles in ER 403 to balance the probative value of the evidence against the possible prejudice. Carver, 37 Wash.App. at 124, 678 P.2d 842.
Considering Kilgore's first claim, the relevance of the prior abuse to explain an alternative source for Epstein-Ross's worrisome finding outweighs any possible prejudice. The only reason Epstein-Ross's diagnosis would be relevant is to suggest Kilgore penetrated C.M. But Kilgore made an offer of proof that showed that another individual had pleaded guilty to digitally penetrating C.M. As this prior abuse could have been the cause of the worrisome finding, it was highly relevant and admissible.[10] Thus, it was error to exclude the evidence.
The State counters that State v. Hancock, 46 Wash.App. 672, 679, 731 P.2d 1133 (1987), aff'd, 109 Wash.2d 760, 748 P.2d 611 (1988), holds that the details of past sexual abuse are not admissible and, therefore, Kilgore's evidence that C.M. had been penetrated was not admissible. In Hancock, the appellate court held that the trial court had the discretion to suppress the details of prior abuse; it did not hold that the trial court must suppress those details. Hancock, 46 Wash.App. at 679-80, 731 P.2d 1133. Although the trial court may limit testimony so that only the relevant portions are admitted, there is no absolute bar on details, especially when those details are highly relevant.
The State also argues that the error was harmless. Because suppressing this evidence denied Kilgore his constitutional right to confront a witness, this error must be harmless beyond a reasonable doubt to avoid reversal. See Guloy, 104 Wash.2d at 425, 705 P.2d 1182.
*318 In child sex abuse cases, where the defendant has consistently denied committing the acts and the case centers around credibility, a physical finding serves to bolster the child's testimony. See generally, e.g., State v. Alexander, 64 Wash.App. 147, 154, 822 P.2d 1250 (1992) (discussing the significance of credibility in child sex abuse cases). Here, although the physical finding does not directly implicate Kilgore, it does indirectly implicate him. See State v. Florczak, 76 Wash.App. 55, 74, 882 P.2d 199 (1994) (holding that a finding of abuse implicated the defendant when no other perpetrator is suggested), review denied, 126 Wash.2d 1010, 892 P.2d 1089 (1995). If it did not implicate Kilgore, it would not be relevant. Thus, this error tainted the State's best evidence C.M.'s testimony.
Other than C.M.'s direct testimony, the only evidence implicating Kilgore is circumstantial. First, it is uncontested that he was with C.M. during the times she said rape and molestation occurred. Second, Cheryl M. testified about C.M.'s and Kilgore's odd behavior on the night C.M. alleges that the molestation occurred (Kilgore lighting the candles and C.M. seeming nervous and still awake at midnight). Third, Kilgore admitted to Cheryl M. and his wife that maybe he had done something. Fourth, Cheryl M. testified about an incident where Kilgore asked to take C.M. out and then brought her home in a low-cut, silky black dress and high heels. Finally and most significantly, during his testimony, Kilgore denied that he had confessed, he denied that C.M. had been awake the night he lit the candles, and he denied that he had bought C.M. the low-cut silky black dress that Cheryl M. had seen. These denials make the case not just a contest between C.M.'s and Kilgore's credibility, but also a contest among Nicolette's and Cheryl M.'s and Kilgore's credibility. Nevertheless, C.M.'s credibility was still a central issue and physical corroborative evidence served to aid the jury in weighing that credibility. Moreover, Kilgore's confession was extremely vague. Thus, under the constitutional error analysis, the error was not harmless beyond a reasonable doubt.
Although we reverse because this evidence was admissible to explain the physical findings, we also address Kilgore's second argument to guide the court on retrial as the State may choose not to offer the physical findings into evidence. Kilgore claims that under Carver, C.M.'s past abuse was admissible to rebut the inference that she gained her sexual knowledge from him (the Carver inference). In Carver, the court stated that the evidence was probative "to rebut the inference [the child] would not know about such sexual acts unless [he or she] had experienced them with defendant." Carver, 37 Wash.App. at 124, 678 P.2d 842. The court then stated that trial courts should balance the probative value and prejudice but it did not provide any further guidance on how courts should engage in this balancing process.
One commentator, noting the absence of clear guidance across the country concerning this balancing process, suggests a series of factors courts should consider.[11] When determining the probative value, courts should consider (1) the age of the victim: the older the child, the less likely the jury will give significant weight to the fact that the child can describe sexual acts; (2) how explicit was the child's testimony: the more explicit, the more likely the Carver inference will arise; (3) whether the evidence suggests other sources for the child's knowledge such as learning it from other children that are independent of the alleged abuse by the defendant and the other abuser; (4) whether the evidence suggests any bias or motive falsely to accuse the defendant: if one exists, the prior abuse will be more relevant; and (5) the remoteness in time of the prior abuse: the longer ago it occurred, the less relevant it will be.[12]
When considering the prejudice, courts should consider possible risks to the trial process and to the victim.[13] The admission *319 of prior abuse affects the trial process because it can mislead the jury by focusing attention on the child.[14] When a child has been abused in the past, the jury might infer that the child either willingly participated in the current abuse or provoked it, especially if the child is older.[15] Conversely, despite that it is not uncommon for a child to be abused by more than one person, the jury may doubt that any child could be so unfortunate.[16] The evidence can affect the victim by forcing the child to testify about two traumatizing events, rather than one.[17] This could discourage the reporting of abuse.[18] The evidence also invades the child's privacy.[19] Courts should consider these factors and others the courts find relevant when determining whether the risk of the Carver inference makes a child's prior abuse more probative than prejudicial.
The commentator suggests three situations where the relevance will outweigh any prejudice. First, if the prosecutor argues that the child's sexual knowledge is not age appropriate, the defense must be allowed to introduce evidence of prior abuse to show an alternative source for that knowledge.[20] Second, if the evidence suggests a strong motive to lie, and there is a connection between that motive and the prior abuse, evidence of prior abuse may be relevant.[21] Third, if the child's testimony is particularly graphic, no alternative source exists for this knowledge, and the prior abuse involves those same graphic details, the evidence may be admissible.[22] These situations should not be seen as the only situations where evidence of prior abuse is admissible, but they merely serve as examples. The case at bar suggests a fourth situation, where the prosecution submits physical evidence of penetration and the past abuse involved penetration.
Here, C.M. was 11 years old when she testified, which is relatively mature. Her testimony was fairly explicit, but not at all similar to the prior abuse. By age 11, she certainly could have learned about sex through other sources besides from the defendant or past abuser, but no such source was suggested. There was no evidence that C.M. was biased against Kilgore, but there was some suggestion that she wanted to move back with her mother. Finally, the past abuse was very recent. On retrial, if the State does not offer evidence of the physical finding,[23] the court should consider the above factors to determine whether C.M.'s prior abuse is admissible to rebut the Carver inference.

Admission of C.M.'s Statements Under ER 803(a)(4)
Kilgore next contends that the trial court erred in admitting C.M.'s statements to Epstein-Ross because when young children make statements to a doctor, the hearsay exception in ER 803(a)(4) is no longer a firmly rooted exception.[24] Although we reverse the convictions involving C.M., we address this issue as it will arise on retrial.
*320 Under ER 803(a)(4), "Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment" are admissible. To be admissible, the declarant's apparent motive must be consistent with receiving treatment and the statements must be information upon which the medical provider reasonably relies to make a diagnosis. State v. Lopez, 95 Wash.App. 842, 849, 980 P.2d 224 (1999). Determining the declarant's motive "rarely presents difficulty [for the court because] the circumstances generally speak for themselves." 4 CLIFFORD S. FISHMAN, JONES ON EVIDENCE § 30:11, at 744 (7th ed.2000). But courts have recognized that very young children might not understand why they are at a doctor's office, so courts apply a different test for those very young children: A very young child's statement to a medical provider is admissible under the exception if there is corroborating evidence of the statement and it appears unlikely that the child would fabricate the cause of the injury. Florczak, 76 Wash.App. at 65, 882 P.2d 199.
This different test raises an additional issue under the confrontation clause. To avoid violating a defendant's right to confront a witness, the prosecution offering hearsay testimony must have the declarant testify, show that the exception is firmly rooted, or show that the statement bears adequate indicia of reliability. U.S. CONST. amend. 6; Florczak, 76 Wash.App. at 68, 882 P.2d 199. The medical-diagnosis exception is normally a firmly rooted exception, but this is not true for statements by very young children under the alternative test in Florczak. See Florczak, 76 Wash.App. at 69, 882 P.2d 199; see also White v. Illinois, 502 U.S. 346, 112 S.Ct. 736, 116 L.Ed.2d 848 (1992) (holding the medical diagnosis exception is firmly rooted). Thus, under that test, the prosecution must either have the child testify or prove the statements are reliable.
Here, we hold that C.M.'s statements were admissible under this exception. The record shows that C.M. was almost 11 years old when she visited Epstein-Ross at a hospital so we can assume she had a treatment motive.[25] Because of her age, it is unnecessary to address the secondary test laid out in Florczak. Epstein-Ross also testified that a patient's history forms an integral part of her diagnosis. Thus, the foundational requirements were met. Because the medical-diagnosis exception is firmly rooted, and because C.M. testified, there is no confrontation issue and the trial court properly exercised its discretion when it admitted C.M.'s statements to Epstein-Ross.
Kilgore relies upon State v. Carol M.D. to argue that the State was required to affirmatively establish that C.M. had a treatment motive for making her statements. See State v. Carol M.D., 89 Wash.App. 77, 948 P.2d 837 (1997), rev'd and remanded for reconsideration on other grounds sub nom., State v. Doggett, 136 Wash.2d 1019, 967 P.2d 548 (1998). Carol M.D. is distinguishable because it involved a therapist and the child explicitly denied knowing what a therapist did. When the party is offering hearsay testimony through the medical-diagnosis exception, when the declarant has stated he or she does not know what the medical personnel to whom the statement was made does, and when the opposing party makes a proper foundation objection after the declarant denies having such knowledge, the party offering the statement must affirmatively establish the declarant had a treatment motive. Otherwise, as long as the declarant is not a very young child, courts may infer the declarant had such a motive.

Kilgore's Right to Confront Lynn B.
Kilgore also contends that the trial court violated his right to confront Lynn B. because the trial court refused to allow him to *321 question her about an accident she was involved in, for which she was convicted of DUI, and about a time she was arrested for shoplifting.
The confrontation clause in the Sixth Amendment protects a defendant's right to cross-examine witnesses. State v. Johnson, 90 Wash.App. 54, 69, 950 P.2d 981 (1998). Courts should zealously guard this right and allow a defendant great latitude to expose a witness's bias, prejudice, or interest. State v. Knapp, 14 Wash.App. 101, 107-08, 540 P.2d 898, review denied, 86 Wash.2d 1005 (1975). Nevertheless, the trial court still has discretion to control the scope of cross-examination and may reject lines of questions that only remotely tend to show bias or prejudice, or where the evidence is vague or merely speculative or argumentative.[26]State v. Jones, 67 Wash.2d 506, 512, 408 P.2d 247 (1965); Knapp, 14 Wash.App. at 108, 540 P.2d 898.
Courts should exclude evidence that is remote, vague, speculative, or argumentative because otherwise "all manner of argumentative and speculative evidence will be adduced," greatly confusing the issue and delaying the trial. Jones, 67 Wash.2d at 512, 408 P.2d 247. This justification for limiting the scope of cross-examination is similar to the reasons that courts limit when defendants may present evidence of other suspects.
When a defendant wishes to offer evidence that a third person committed the crime charged, the defendant must offer more than evidence that a third person had a motive to commit the crime. State v. Mak, 105 Wash.2d 692, 717, 718 P.2d 407, cert. denied, 479 U.S. 995, 107 S.Ct. 599, 93 L.Ed.2d 599 (1986). If motive alone were enough, "a great many trial days might be consumed in the pursuit of inquiries which could not be expected to lead to any satisfactory conclusion." Mak, 105 Wash.2d at 717, 718 P.2d 407 (quotation omitted). Therefore, courts require a defendant to show "a train of facts" that clearly suggest someone else committed the crime. Mak, 105 Wash.2d at 716, 718 P.2d 407.
Following a similar line of reasoning, the Knapp court limited the scope of cross-examination to prevent the defendant from questioning the complaining witness about two prior instances that the defendant claimed showed this witness was biased. In these incidents, the witness had tried to convince the defendant to commit crimes. The defendant had other evidence suggesting this witness wanted the defendant in jail, and the defendant wanted to explore the two incidents to support that theory. The trial court ruled that absent evidence showing the witness had attempted to lay a trap during these prior incidents, this evidence was too remote to show bias. On appeal, this court affirmed, holding that the trial court acted within its discretion. Knapp, 14 Wash.App. at 108, 540 P.2d 898.
Here, the trial court properly exercised its discretion in suppressing evidence relating to Lynn B.'s DUI conviction and arrest for third degree theft. The DUI conviction itself is not relevant to credibility under ER 609. See State v. Barker, 75 Wash.App. 236, 242-43, 881 P.2d 1051 (1994). The arrest for third degree theft is not admissible under ER 609 because it is not a conviction. See State v. Roberts, 25 Wash. App. 830, 837, 611 P.2d 1297 (1980).
Kilgore argues that Lynn B's DUI conviction was admissible because thereafter, he refused to allow his children to ride with Lynn B. (their grandmother) and this caused tension. The problem with this argument is that it provides no link between this tension and four children's allegations that Kilgore molested and raped them; it is too speculative to say a grandmother would prompt children to accuse her son-in-law of child molestation and rape merely because she wants to drive her grandchildren around.
*322 Lynn B. moved to Washington in fall 1995. Kilgore alleges the tension arose between him and Lynn B. within a month of her moving to Washington, but she did not call Child Protective Services regarding Kilgore's alleged actions until May 1996. Moreover, Lynn B. did not accuse Kilgore of raping or molesting her; rather C.M., A.B., D.O., and T.O. have accused Kilgore of raping and molesting them. Kilgore has not pointed to any evidence that suggests Lynn B. asked or convinced these four children to lie about Kilgore. He merely cites facts that show Lynn B. had contact with her two sons, D.O. and T.O., and the mothers of C.M. and A.B. He fails to provide a link or "train of facts" that suggest that the animosity engendered by his refusal to allow Lynn B. to drive with his children caused the four children to accuse him of molesting and raping them. Thus, the trial court properly exercised its discretion when it limited the scope of cross-examination.[27]
Kilgore's reliance upon State v. Roberts is misplaced. See Roberts, 25 Wash.App. 830, 611 P.2d 1297. That case concerned the defendant's ability to cross-examine the alleged victim about whether her parents had physically disciplined her to force her to give a statement to the prosecutor's office. Moreover, that same witness admitted making several false statements about essential details in her first statement to the police. Thus, Roberts stands for the proposition that "[w]here a case stands or falls on the jury's belief or disbelief of essentially one witness, that witness'[s] credibility or motive must be subject to close scrutiny." Roberts, 25 Wash. App. at 834, 611 P.2d 1297. Here, Lynn B was not the accuser, and the case did not rise or fall on whether the jury believed her testimony. Consequently, the strong language in Roberts does not control this case and Kilgore's argument fails.

Refusal to Hear Testimony on ER 404(b) Evidence
Finally, Kilgore contends that the trial court erred when it accepted the State's offer of proof and refused to hold an evidentiary hearing and hear testimony before it found by a preponderance of the evidence that Kilgore's prior misconduct with the children occurred. The ER 404(b) evidence admitted at trial came in through C.M. (testifying about a second molestation); D.O. (testifying about a second molestation); A.B. (testifying that Kilgore had molested her six or seven other times); Nicolette (testifying about A.B. describing the incident where she stripped for Kilgore, D.O., and T.O.); and Bujnowski (testifying that A.B. told her she had been raped or molested five or six other times and told her Kilgore had her watch a pornographic video).
The trial court must find by a preponderance of the evidence that the misconduct occurred to admit evidence of other wrongs under ER 404(b). State v. Pirtle, 127 Wash.2d 628, 648-49, 904 P.2d 245 (1995), cert. denied, 518 U.S. 1026, 116 S.Ct. 2568, 135 L.Ed.2d 1084 (1996). We uphold the trial court's finding if substantial evidence in the record supports it. State v. Roth, 75 Wash.App. 808, 816, 881 P.2d 268 (1994), review denied, 126 Wash.2d 1016, 894 P.2d 565 (1995).
Kilgore argues that the trial court cannot make a finding of preponderance based solely upon an offer of proof and, thus, must hold a hearing. This argument ignores one of the fundamental purposes of an offer of proof: to "inform[ ] the [court] of the specific nature of the offered evidence so that the court can assess its admissibility[.]" State v. Ray, 116 Wash.2d 531, 538, 806 P.2d 1220 (1991). Moreover, the rules of evidence do not apply to preliminary determinations. ER 104(a), 1101(c)(1).
The Minnesota Supreme Court rejected a similar argument in State v. Kasper, 409 N.W.2d 846 (Minn.1987). There, the defendant had argued that an offer of proof is insufficient and an evidentiary hearing with testimony was required before the court could rule ER 404(b) evidence was admissible. Rejecting this argument, the court reasoned that the trial court should be able to rely upon the prosecutor's ethical duty to *323 give an accurate offer of proof, and the trial court could always strike any testimony that did not conform to that offer of proof or if the trial court thought the evidence was not supported by a preponderance when offered. State v. Kasper, 409 N.W.2d 846, 847 (Minn. 1987).[28] In contrast to an orderly offer of proof, an evidentiary hearing with testimony would amount to a mini-trial that would delay the trial proper. Kasper, 409 N.W.2d at 847.
Here, the trial court exercised its discretion by accepting the prosecutor's offer of proof and refusing to hold a mini-trial before ruling on the ER 404(b) issue. The prosecutor detailed the incidents that amounted to the prior bad acts, and he was ethically bound to make this offer in good faith. If the trial testimony deviated from this offer, the trial court could strike it and instruct the jury to disregard it.[29] Thus, an evidentiary hearing would only have delayed the trial so that defense counsel could have an additional opportunity to cross-examine numerous witnesses.[30] The trial court should not be required to hold this type of mini-trial when the trial proper would give the defendant his or her constitutional right to confront the witnesses, especially in cases like the one at bar, where testifying just once is a traumatic experience for the witnesses.
The State notes that a Division One case, State v. Binkin, 79 Wash.App. 284, 290, 902 P.2d 673 (1995), review denied, 128 Wash.2d 1015, 911 P.2d 1343 (1996), has held that the court must hold an evidentiary hearing and hear testimony when the defendant contests the existence of the prior misconduct. We reject this concession and decline to follow Binkin for various reasons.[31]
First, the Binkin court cites no cases that hold that a hearing is required. Instead, the court cites cases holding that the court must find that acts occurred by a preponderance of the evidence. Binkin, 79 Wash.App. at 290, 902 P.2d 673. The Binkin court seemed to find that "preliminary finding" was synonymous with "evidentiary hearing." See Binkin, 79 Wash.App. at 290, 902 P.2d 673 (quoting State v. Benn, 120 Wash.2d 631, 653, 845 P.2d 289, cert. denied, 510 U.S. 944, 114 S.Ct. 382, 126 L.Ed.2d 331 (1993)).
Second, after holding that an evidentiary hearing is required, the Binkin court then sets out a harmless error test that will make the failure to hold such a hearing harmless in every case. The court held that the failure to hold an evidentiary hearing was harmless error when substantial evidence is admitted at trial to support a finding by a preponderance that the prior bad acts occurred.[32]Binkin, 79 Wash.App. at 290, 902 P.2d 673. Case law already holds that the failure to balance the probative value of evidence against its prejudice is harmless if the appellate court can perform the balancing based upon its review of the record, see, e.g., State v. Carleton, 82 Wash.App. 680, 686, 919 P.2d 128 (1996), so it is logical that a similar test should apply here. But a defendant can only assign error to statements that were actually admitted at trial, so by definition there will be substantial evidence in the record and the error will always be harmless. As a result, the Binkin court has created a rule that is not supported by case law and serves no practical purpose.
Finally, as noted, to require the trial court to hear testimony would require a *324 mini-trial. Instead, we hold that the trial court needs only to hear testimony when it cannot fairly decide, based upon the proponent's offer of proof, that the 404(b) incident probably occurred.[33] Of course, such offer of proof or testimony must be heard out of the jury's presence.
We reverse Counts I and II, affirm Counts III VII, and remand for further proceedings.
We concur: BRIDGEWATER, J., and HUNT, A.C.J.
NOTES
[1] Epstein-Ross explained that there are four categories of findings. First, there is normal. This finding suggests no abuse. Second, there is non-specific. This finding does not suggest abuse but is consistent with abuse. Third, there is worrisome. This finding suggests abuse. Finally, there is abnormal. This is a specific finding of penetration.
[2] State v. Carol M.D., 89 Wash.App. 77, 948 P.2d 837 (1997) (holding that State failed to establish a child's statements to a therapist qualified under the medical-diagnosis hearsay exception) rev'd and remanded for reconsideration on other grounds sub nom., State v. Doggett, 136 Wash.2d 1019, 967 P.2d 548 (1998).
[3] The prosecutor noted numerous other incidents, but offered no evidence on these incidents at trial.
[4] The State counters that Kilgore waived this issue by stipulating that A.B.'s hearsay statements to one of the witnesses were admissible under this exception. Br. of Respondent 35; see also CP 138 (stipulation). Although Kilgore did stipulate, after the incident arose with A.B. allegedly saying she made up the allegations, Kilgore moved to prevent the admission of A.B.'s hearsay statements because A.B. did not testify that there was penetration. Thus, this issue is properly before us.
[5] The child need not go into great detail about the event. State v. Montgomery, 95 Wash.App. 192, 199, 974 P.2d 904, review denied, 139 Wash.2d 1006, 989 P.2d 1139 (1999).
[6] To the extent that Kilgore argues that State v. Rohrich, 132 Wash.2d 472, 482, 939 P.2d 697 (1997), adds requirements to RCW 9A.44.120 beyond what Clark and the confrontation clause require, we reject that contention. In Rohrich, the court only addressed the defendant's claim because it was of a constitutional magnitude. Rohrich, 132 Wash.2d at 476 n. 7, 939 P.2d 697. Moreover, its analysis was almost entirely "in light of the requirements of the [c]onfrontation [c]lause." Rohrich, 132 Wash.2d at 476, 939 P.2d 697. Thus, because it was only addressing the issue as a manifest error affecting a constitutional right, it cannot be read as adding any requirements beyond those of the constitution. And in Clark, the court backed away from its analysis of the confrontation clause in Rohrich and held the clause was not violated if the child did not testify about the abuse either because he or she had recanted or did not remember the events, but did testify about the hearsay statements. Clark, 139 Wash.2d at 159-60, 985 P.2d 377. Therefore, we rely solely upon Clark and the confrontation clause to determine the requirements of RCW 9A.44.120.
[7] RAP 1.2(c) provides in part, "The appellate court may waive or alter the provisions of these rules ... to serve the ends of justice[.]"
[8] CrR 4.7(d) provides:

Material Held by Others. Upon defendant's request and designation of material or information in the knowledge, possession or control of other persons which would be discoverable if in the knowledge, possession or control of the prosecuting attorney, the prosecuting attorney shall attempt to cause such material or information to be made available to the defendant. If the prosecuting attorney's efforts are unsuccessful and if such material or persons are subject to the jurisdiction of the court, the court shall issue suitable subpoenas or orders to cause such material to be made available to the defendant.
[9] CrR 4.7(a)(3) provides:

Except as is otherwise provided as to protective orders, the prosecuting attorney shall disclose to defendant's counsel any material or information within the prosecuting attorney's knowledge which tends to negate defendant's guilt as to the offense charged.
[10] At oral argument, the State asserted that digital penetration could not cause hymen damage such as that found here. No evidence in the records supports this assertion. But if the State conclusively establishes this alleged fact on retrial, the trial court should only admit this evidence if its relevance outweighs its prejudice under the standards set forth in this opinion.
[11] See Tanya B. Marcketti, Note, Rape Shield Laws: Do They Shield the Children?, 78 Iowa L.Rev. 751 (1993).
[12] Marcketti, supra, at 761-62.
[13] Marcketti, supra, at 763.
[14] Marcketti, supra, at 763.
[15] Marcketti, supra, at 763, 774-75.
[16] See, e.g., Report of Proceedings at 326 (defense counsel arguing that prior abuse is admissible to suggest a "cry wolf syndrome").
[17] Marcketti, supra, at 763-64. This prejudice can be lessened if the prosecution stipulates to the prior abuse. Marcketti, supra, at 777.
[18] Marcketti, supra, at 777.
[19] Marcketti, supra, at 764.
[20] Marcketti, supra, at 771.
[21] Marcketti, supra, at 771-72. As an example, the commentator cites a case where the child had been removed from a previous household because of abuse and was now seeking to be removed from her current household. The court ruled that evidence she had her previous abuse had resulted in her removal was admissible because she clearly was seeking to get out of the current home. Marcketti, supra, at 770 (citing Commonwealth v. Wall, 413 Pa.Super. 599, 606 A.2d 449, appeal denied, 532 Pa. 645, 614 A.2d 1142 (1992)).
[22] Marcketti, supra, at 772.
[23] But see supra note 10.
[24] Although Epstein-Ross did not repeat any of C.M.'s actual statements, Kilgore asserts that Epstein-Ross's statement that her worrisome finding was consistent with the history C.M. gave her was equivalent to Epstein-Ross testifying to that history.
[25] Although these circumstances speak for themselves, other evidence suggested C.M. had a treatment motive. Epstein-Ross testified that C.M. told her she knew she was at the doctor's office because Kilgore raped her and Epstein-Ross testified that she told C.M. she needed to look at C.M.'s body to make sure she was healthy. Finally, C.M. asked specific questions seeking medical advice.
[26] Kilgore argues that because this involves a constitutional right, the standard of review is de novo. Case law is clear, however, that the standard is abuse of discretion, and Kilgore cites no authority to the contrary. See, e.g., State v. Mak, 105 Wash.2d 692, 710, 718 P.2d 407, cert. denied, 479 U.S. 995, 107 S.Ct. 599, 93 L.Ed.2d 599 (1986); State v. Kunze, 97 Wash.App. 832, 859, 988 P.2d 977 (1999), review denied, 140 Wash.2d 1022, 10 P.3d 404 (2000).
[27] Kilgore makes no argument about why the arrest for third degree theft would be admissible.
[28] In Minnesota, the trial court must find by clear and convincing evidence that the witness did the prior bad act. State v. Bolte, 530 N.W.2d 191, 197 (Minn.1995). This is a higher standard than in Washington.
[29] Depending upon the nature of the 404(b) evidence, a mistrial, rather than merely striking the testimony, may be the appropriate remedy.
[30] As noted, evidence of Kilgore's prior bad acts came in through C.M., A.B., D.O., Nicolette, and Bujnowski.
[31] Division Three recently cited Binkin with approval. See State v. Barragan, 102 Wash.App. 754, 9 P.3d 942 (2000). In this case, the court held an evidentiary hearing so the opinion provided no additional analysis of this issue.
[32] This is because the trial court would have presumably reversed its earlier ruling if it decided the produced evidence was insufficient so "it would be a useless act to remand for a new trial in which the court would make the same finding after a pretrial hearing." Binkin, 79 Wash.App. at 290-91, 902 P.2d 673.
[33] The appellate court reviews this determination for an abuse of discretion.