# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | ) No. 76059-9-I |
| Respondent, | ) |
| | ) DIVISION ONE |
| v. | ) |
| THOMAS PIPES, SR., | ) UNPUBLISHED OPINION |
| Appellant. | ) FILED: June 4, 2018 |

BECKER, J. — Appellant, convicted of one count of child molestation, challenges the State's late disclosure of allegedly exculpatory evidence and the trial court's determination that the child victim was competent to testify. He also contends the trial court erred in admitting child hearsay and in excluding evidence of alleged prior abuse by a different person. We affirm.

During the summer of 2014, As.D lived in Monroe with her 6-year-old daughter A.D. and A.D.'s younger brother. Because As.D commuted to work in Redmond, the two children often stayed during the week in Bothell with Kimberli and appellant Thomas Pipes Sr. Kimberli is As.D's mother. Pipes is her stepfather and is thus the step-grandfather of A.D.

When spending the night in Bothell, the two children generally slept on a mattress on the floor of the grandparents' bedroom. The grandparents routinely

gave the children back rubs or "rubbies" at bedtime to help them get to sleep. Kimberli and Pipes were planning to move in with As.D.

On the evening of August 31, 2014, as As.D was tucking A.D. into bed at home, A.D. giggled nervously and said, "'Mom, I need to tell you something.'" A.D. then said that she did not want Pipes to move in. Although somewhat reluctant, A.D. said that when Pipes gave her "rubbies," he rubbed her "girl parts." A.D. indicated that it had happened on two occasions. A.D. responded "no" when As.D asked if Pipes had ever "poked her butt or . . . her front pee-pee."

As.D reported the conversation to the police, who advised her to take A.D. to the hospital emergency room. On the following day, As.D took A.D. to Evergreen Monroe Hospital to meet with Lori Moore, a forensic nurse examiner.

Moore asked A.D. why she came to the hospital. A.D. responded, "'because my grandpa touches me.'" A.D. said Pipes had touched her with his hand "'in my private part.'" When Moore asked where her private part was, A.D. pointed to her crotch area. A.D. said that the touching occurred in the Pipes' bedroom. During a physical examination, Moore observed genital erythema or redness, but no injuries. Moore could not determine the cause of the redness.

After the hospital visit, As.D took A.D. home, where several relatives and family friends had gathered. During the course of the evening, Danica Pornel took A.D. upstairs to talk to her alone. Pornel was dating A.D.'s uncle and thought of A.D. as a "little sister." At first, A.D. was shy and reluctant to say

anything.  Without providing specific details, Pornel told A.D. that she had "went through something similar with my grandfather" and encouraged A.D. to tell her if something was bothering her.  A.D. eventually told Pornel that she was afraid of Pipes and did not want him to move in.  A.D. said that Pipes rubbed her and "makes my body feel funny."  A.D. whispered to Pornel that Pipes would put his fingers "in her butt hole."  A.D. indicated the touching occurred both over and under her underwear.

On September 2, 2014, A.D. spoke with Heidi Scott, a forensic interviewer.  During the interview, A.D. described how Pipes had rubbed various parts of her body.  A.D. did not want to name one of the spots that Pipes rubbed but said it was "a real funny word" and "embarrassing."  When asked to write the word, A.D. wrote "koh."  Scott ended the interview when A.D. said she was tired.

A.D. spoke with Scott again on the following day.  A.D. recalled that "my grandpa rubbed all over my body" and "it's like he's rubbing my body all at night and he rubs my body everyday."  She said that Pipes was rubbing "mostly everywhere" and that the rubbing felt "weird."  A.D. felt "kinda . . . great" about not seeing Pipes again because she wanted him to stop rubbing her.

On September 3, 2014, Snohomish County Sheriff's Office detectives spoke with Pipes at the school in Everett where he taught.  Pipes explained that he and Kimberli would routinely have the children go to sleep between them in the bed and then later move them to a mattress on the floor.  A.D. would

-3-

generally be next to Pipes. Pipes acknowledged that he routinely gave A.D. "rubbies" but denied ever touching A.D.'s genitals. Pipes said he had observed A.D. stimulating her "hooch" (genital area) and "button" (clitoris) with a pillow. Pipes said he told A.D. she was not old enough for this behavior.

Detectives spoke with Pipes again on October 2, 2014, after he completed a polygraph examination.[1] During the interview, Pipes said that he had used his cell phone to take pictures of A.D.'s genital areas after she took a bath. During the process, he touched A.D.'s leg "next to the labia in order to help spread the area so he could get a good picture." Pipes also made a video recording of A.D. masturbating. Pipes said that he took the pictures and video in order to educate A.D. and answer some of her questions and to show A.D.'s mother. Pipes did not show the pictures or video to anyone and later deleted them. Pipes gave his cell phone to the detectives for forensic testing.

Pipes also recalled that on one occasion, he had fallen asleep on the bed after taking some pain medication. He awoke suddenly and found A.D. rubbing her vagina on his hand. Pipes explained that this was "'the only time I was out of control.'"

---

[1] Pipes' participation in the polygraph examination was not disclosed to the jury.

No. 76059-9-I/5

In November 2015, just before a scheduled defense interview, A.D. told her mother that Pipes "had licked her butt hole and she didn't think it tasted very good." Heidi Scott conducted a third forensic interview of A.D. on November 13, 2015. During the interview, A.D. indicated that Pipes had not rubbed her with anything other than his hand.[2]

The State charged Pipes with one count of child molestation in the first degree. Following a pretrial hearing, the trial court found that A.D. was competent to testify and that her statements were admissible under the child hearsay statute, RCW 9A.44.120.

At trial, A.D. was reluctant to talk about the charged offense. She repeatedly indicated that she had forgotten certain details but admitted that she was "shy" about being in the courtroom. A.D. explained that she stopped going to the school she was attending when Pipes did "bad stuff" to her. At first, A.D. did not specify the nature of the "bad stuff" but admitted that she had told others about it, including her mother, Pornel, and the forensic nurses. A.D. finally acknowledged that Pipes had made her feel "uncomfortable" when he touched "my private parts" with his hands. A.D. explained that she used her private parts

---

[2] The three forensic interviews with Scott were video recorded and played for the jury.

No. 76059-9-I/6

for "going to the bathroom" and that Pipes had touched her privates in the bedroom on more than one occasion.

Detective Tyler Quick of the Snohomish County Sheriff's Office testified that he conducted a forensic search of Pipes' cell phone. Quick was unable to recover any deleted files from the phone's memory. Quick then provided the cell phone to the United States Secret Service for further examination.

A Secret Service investigator successfully recovered about 160 deleted photographs and videos from the removable memory card of Pipes' cell phone. The recovered photos did not include those that Pipes had described or otherwise have any evidentiary value. The deleted photos and video could have been stored in the cell phone's internal memory, which the investigator was unable to access.

The deputy prosecutor did not learn of the Secret Service report until the State had nearly concluded its case-in-chief. She immediately notified defense counsel of the information.

Defense counsel moved for a mistrial. The trial court denied the motion, finding that the State had exercised due diligence in providing the defense with the information. The court also found that the result of the Secret Service investigation was consistent with Pipes' testimony and did not prevent the defense from presenting its theory of the case. The court also noted that the defense still had time to determine if it needed to call additional witnesses,

-6-

including a defense expert witness, during its own case-in-chief. The court indicated its willingness to consider a defense request for a continuance if it became necessary.

The jury found Pipes guilty as charged.

<u>Disclosure of Cell Phone Testing</u>

Pipes contends that the State's late disclosure of additional cell phone testing violated his rights under <u>Brady v. Maryland</u>, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). His assignment of error states as follows: "The government's suppression of <u>Brady</u> evidence until after trial had commenced requires reversal." This assignment of error fails to comply with the Rules of Appellate Procedure (RAP). RAP 10.3(a)(4) provides that a party's assignments of error should include "[a] separate concise statement of each error a party contends was *made by the trial court*, together with the issues pertaining to the assignments of error." (Emphasis added). By avoiding the requirement to identify action or inaction by the trial court, appellant presents the issue as if it can be decided in the abstract. Assignments of error must be included in the appellant's brief so that the reviewing court can pinpoint the time and place in the record at which the trial court allegedly committed error, either by ruling or by failing to rule.

Here, Pipes has not assigned error to a trial court ruling or a failure to rule. Rather, he formulates the issue of belated disclosure of the cell phone testing

-7-

results in abstract terms as a Brady violation and essentially ignores the fact that the issue was presented to the trial court through a motion for a mistrial. Based on the improper assignment of error, Pipes' opening brief contains some three pages of boilerplate citations to various Brady authorities. Pipes did not call the trial court's attention to any of these citations, and they are not relevant to the trial court's decision on his motion for a mistrial.

We will analyze this case as if appellant had made a proper assignment of error, i.e., "The trial court erred in denying the defendant's motion for a mistrial." A decision denying a motion for a mistrial is reviewed for abuse of discretion. State v. Weber, 99 Wn.2d 158, 166, 659 P.2d 1102 (1983). A mistrial should be granted only when the defendant has been so prejudiced that nothing short of a new trial can insure that the defendant will be tried fairly. State v. Gamble, 168 Wn.2d 161, 177, 225 P.3d 973 (2010). Only those errors that may have affected the outcome of the trial are prejudicial. Weber, 99 Wn.2d at 165.

Pipes moved for a mistrial on September 30, 2016. At the time, the State had nearly completed its case-in-chief. Neither Pipes' written motion nor oral argument mentioned Brady. Rather, Pipes relied solely on CrR 4.7(h)(7)(i), which reads as follows:

> (7) Sanctions.
>     (i) if at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with an applicable discovery rule or an order issued pursuant thereto, the court may order such party to

No. 76059-9-I/9

> permit the discovery of material and information not previously disclosed, grant a continuance, dismiss the action or enter such other order as it deems just under the circumstances.

Granting of a mistrial is an available sanction for a violation of this rule if the State withholds evidence that is favorable to a defendant and material to his case. State v. Jones, 33 Wn. App. 865, 870-71, 658 P.2d 1262, review denied, 99 Wn.2d 1013 (1983).

After hearing argument, the trial court reserved ruling on Pipes' motion. Because of the trial schedule, the parties had several days to obtain some additional materials associated with the Secret Service examination of Pipes' cell phone.

On October 5, 2016, after receiving copies of the recovered photos and videos, Pipes filed a "supplemental defense motion" for a mistrial. The written motion includes a single citation to Brady, but Pipes' legal arguments relied solely on two Washington decisions addressing alleged discovery violations under CrR 4.7. See State v. Dunivan, 65 Wn. App. 728, 829 P.2d 799 (trial court did not abuse its discretion in granting new trial after State failed to disclose that defense witness had been a paid confidential informant against defendant), review denied, 120 Wn.2d 1016 (1992); State v. Linden, 89 Wn. App. 184, 947 P.2d 1284 (1997) (trial court did not abuse its discretion in denying mistrial after

-9-

belated disclosure of defendant's prior arrest for cocaine possession), review denied, 136 Wn.2d 1018 (1998).

Pipes contends that the delayed disclosure of the Secret Service examination of his cell phone prevented him from effectively raising a "false confession" defense or challenging the admission of "lustful disposition" evidence. The record does not support these claims.

During his postpolygraph interview, Pipes admitted that he used his cell phone to take photographs of A.D.'s genitals. He also said that he made a video recording of A.D. masturbating. Pipes explained that he wanted to use the photos and video to educate A.D. and "to show his wife and the child's mother what she was doing, what [A.D.] was asking and what she was doing by touching her own privates." The trial court admitted Pipes' statements about the photos and video for the purpose of showing his "lustful disposition." See State v. Ray, 116 Wn.2d 531, 547, 806 P.2d 1220 (1991) (evidence of collateral sexual misconduct may be admissible to demonstrate the defendant's "lustful disposition" toward the victim).

Clearly, Pipes would have known from the beginning of the case whether the admissions he made about the photos and video were true or false. The defense would also have been aware of the detectives' interrogation techniques during the postpolygraph interview and that Detective Quick had been unable to recover any photos or videos from the cell phone. Under the circumstances,

-10-

No. 76059-9-I/11

nothing prevented Pipes from claiming that the coercive interrogation techniques caused him to lie about taking the photographs. See generally State v. Rafay, 168 Wn. App. 734, 756-66, 285 P.3d 83 (2012), review denied, 176 Wn.2d 1023, cert. denied, 571 U.S. 867 (2013).

The evidence from the Secret Service examination of the cell phone provided scant additional support for a "false confession" defense. Although the federal experts recovered 160 innocuous photos and videos from the cell phone's removable memory card, they were unable to access the cell phone's internal memory. The additional evidence therefore remained essentially consistent with Pipes' statements that he took the photographs and then deleted them. The photos and video could have been saved in the cell phone's internal memory, which no one had been able to access, or they could have been deleted from the memory card and overwritten by subsequently saved files.

Pipes' claim that the additional evidence would have helped him rebut or exclude the "lustful disposition" evidence is not persuasive. Because the new evidence did not seriously undermine the truth of Pipes' admissions, there is no reasonable likelihood it would have had any effect on the trial court's evidentiary ruling.

Moreover, at the time of the disclosure, the State had not yet completed its case-in-chief. Nothing prevented defense counsel from making effective use of

-11-

the new evidence had she so desired. The defense could have recalled any of the State's witnesses for additional cross-examination or asked the trial court to reconsider its ruling on the admission of the "lustful disposition" evidence. The trial court also offered defense counsel time to seek additional witnesses, including an expert witness, and indicated it would consider a continuance if necessary. The court noted that both before and after disclosure of the new evidence, defense counsel remained free to argue that Pipes had falsely confessed and that his admissions were not evidence of a lustful disposition. During closing argument, defense counsel suggested only in passing that the State's inability to find the photos that Pipes described was evidence "that that may never have happened."

Under the circumstances, the record fails to demonstrate any reasonable probability that the result of the trial would have been different had the evidence been disclosed earlier. Nor has Pipes shown that the belatedly disclosed evidence was favorable to him or material to his case. The trial court did not abuse its discretion in denying the motion for a mistrial.

Competency

Pipes next contends the trial court erred in finding A.D. competent to testify. We disagree.

In Washington, all persons are presumed competent to testify regardless of their age. State v. S.J.W., 170 Wn.2d 92, 102, 239 P.3d 568 (2010). The

-12-

party challenging the competency of a child witness bears the burden of rebutting the presumption with evidence establishing one of the statutory grounds for incompetency set forth in RCW 5.60.050, including an inability "of receiving just impressions of the facts, respecting which they are examined, or of relating them truly." RCW 5.60.050(2); see also S.J.W., 170 Wn.2d at 102. The following factors continue to guide the trial court's determination of a child witness's competency:

> "(1) an understanding of the obligation to speak the truth on the witness stand; (2) the mental capacity at the time of the occurrence concerning which he is to testify, to receive an accurate impression of it; (3) a memory sufficient to retain an independent recollection of the occurrence; (4) the capacity to express in words his memory of the occurrence; and (5) the capacity to understand simple questions about it."

In re Dependency of A.E.P., 135 Wn.2d 208, 223, 956 P.2d 297 (1998), quoting State v. Allen, 70 Wn.2d 690, 692, 424 P.2d 1021 (1967). An appellate court necessarily accords significant deference to the trial court's competency determination:

> There is probably no area of the law where it is more necessary to place great reliance on the trial court's judgment than in assessing the competency of a child witness. The trial judge is in a position to assess the body language, the hesitation or lack thereof, the manner of speaking, and all the intangibles that are significant in evaluation but are not reflected in the written record.

State v. Borland, 57 Wn. App. 7, 11, 786 P.2d 810, review denied, 114 Wn.2d 1026 (1990), disapproved on other grounds by State v. Rohrich, 132 Wn.2d 472, 939 P.2d 697 (1997). We will disturb the trial court's competency determination

only for a manifest abuse of discretion. <u>State v. Brousseau</u>, 172 Wn.2d 331, 340, 259 P.3d 209 (2011).

A.D. was about six at the time she disclosed the charged offense and eight and one-half at the time of the competency hearing. She had turned nine by the time she testified at trial.

At the competency hearing, A.D. freely provided details about her family, pets, the school she was attending, her activities at school, and the city she lived in. A.D. also demonstrated that she understood the difference between the truth and a lie.

At first, A.D. said she could not remember what she told her mother about Pipes. But after first saying that she did not remember, A.D. described the touching:

> Q. What did you tell your mom?
> A. I don't remember what I told my mom.
> Q. Okay. Did you tell your mom something that happened to you?
> A. Yes.
> Q. Okay. What did you tell her?
> A. I told her that Tom touched my privates.
> Q. Touched your privates? Okay. What do you use your privates to do?
> A. Going to the bathroom.
> Q. Going to the bathroom, okay. A.D., do you understand it's important to tell the truth?
> A. Yes.
> Q. And do you know the difference between telling the truth and telling a lie?
> A. Yes.
> Q. So if I told you that that piece of paper over there was green, would that be the truth or a lie?
> A. A lie.

Q. Okay. And do you know that it's important to tell the truth here today?
A. Yes.
Q. Okay. A.D., you said that you told your mom that Tom touched your privates. How did it make you feel when Tom touched your privates?
A. I did not like it.
Q. Okay. And how come you told your mom that Tom touched your privates?
A. I don't know. Because I need to tell somebody.

At the competency hearing, the trial court heard testimony that A.D. was "articulate for her age" and that her truthfulness was "[e]xcellent." The court also considered the video recordings of A.D.'s interviews. Based on the testimony and other evidence, the court found A.D. competent:

Clearly, based upon what I've seen, [A.D.] is competent. She's clear. She's articulate. She shows insight. She understands the time, place and manner of the event as she understands it. She has a good command of the English language. At six years old she also had quite a bit of a good command of the English language and a good understanding of what was happening.

One thing that came to mind as I was thinking about this was I think it's the third interview where she asks for pencil and paper and begins to write things down. In terms of competency, not credibility, but in terms of competency, when a witness can say I can't tell you because I think she was embarrassed, but I can write it down for you, I'm not talking about in terms of credibility, is this a competent witness? The answer is yes. [A.D.] is a competent witness. . . . She clearly demonstrated she knew the difference between a truth and a lie.

. . . And so while I do feel that maybe the encounter with her -- with [Pornel] did involve some leading questions on the issue of competency, I don't have any doubt at this point. I'll find she's a competent witness.

Contrary to Pipes' contentions, the record supports the trial court's determination that A.D. had a sufficient memory of the abuse and the mental capacity to describe the incident in words. The trial court did not abuse its discretion in finding A.D. competent to testify.

Pipes correctly notes that A.D. frequently responded initially to questions by saying that she could not remember or did not know. But her claims of a lack of memory were often followed by a disclosure about some detail about the touching. Inconsistencies and contradictions do not render a witness incompetent. State v. Stange, 53 Wn. App. 638, 642, 769 P.2d 873, review denied, 113 Wn.2d 1007 (1989). Rather, such inconsistencies go to the weight of the testimony, not its admissibility. Stange, 53 Wn. App. at 642. The trial court was in the best position to determine, based on A.D.'s demeanor, whether A.D.'s reluctant disclosures reflected a lack of memory or merely her embarrassment or unwillingness to talk about the incident in the courtroom. "A child's reluctance to testify about specific acts of abuse does not render him or her incompetent." State v. Carlson, 61 Wn. App. 865, 875, 812 P.2d 536 (1991), review denied, 120 Wn.2d 1022 (1993). We find no abuse of discretion.

Pipes also appears to contend that evidence presented at trial demonstrated A.D.'s incompetence. See generally State v. Brousseau, 172 Wn.2d at 347 (witness's trial testimony may be relevant to competency). In particular, he claims that the repeated questioning "tainted" A.D.'s testimony.

"Competency may be challenged at any time, including at trial."
Brousseau, 172 Wn.2d at 347. Consequently, a criminal defendant may renew a pretrial competency challenge during trial. Brousseau, 172 Wn.2d at 348. "A child found competent at one point in time may become incompetent at trial, at which point a litigant may raise an objection based on the child's trial testimony." Brousseau, 172 Wn.2d at 348.

But Pipes did not raise this objection at trial or renew his challenge to A.D.'s competency. See Brousseau, 172 Wn.2d at 348. Nor has he demonstrated a manifest constitutional error warranting consideration for the first time on appeal. See RAP 2.5(a)(3); see also Brousseau, 172 Wn.2d at 335 (because the consequence of even an erroneous pretrial finding of witness competency is that the witness will testify at trial and be subject to cross-examination, risk of due process violation is minimal). Accordingly, we decline to review this argument.

Child Hearsay

Pipes contends the trial court's admission of A.D.'s statements to her mother, the forensic nurse, Pornel, and the forensic examiner violated the child hearsay statute. RCW 9A.44.120.

An out-of-court statement by a testifying child victim is admissible under RCW 9A.44.120(1) if the court finds "that the time, content, and circumstances of the statement provide sufficient indicia of reliability." In determining the reliability

of child hearsay, a court considers nine nonexclusive factors, including (1) whether the declarant had an apparent motive to lie; (2) the declarant's general character; (3) whether more than one person heard the statement; (4) the spontaneity of the statement; (5) the timing of the declaration and the relationship between the declarant and the witness; (6) whether the statement contains express assertions of past fact; (7) whether the declarant's lack of knowledge could be established by cross-examination; (8) the possibility of the declarant's recollection being faulty; and (9) whether the circumstances suggest the declarant misrepresented the defendant's involvement. State v. Ryan, 103 Wn.2d 165, 175-76, 691 P.2d 197 (1984). The court considers the foregoing factors as a whole; no single factor is decisive. State v. Young, 62 Wn. App. 895, 902, 802 P.2d 829, 817 P.2d 412 (1991); State v. Swan, 114 Wn.2d 613, 652, 790 P.2d 610, cert. denied, 498 U.S. 1046 (1990). We review the trial court's determination of reliability solely for a manifest abuse of discretion. State v. Pham, 75 Wn. App. 626, 631, 879 P.2d 321 (1994), review denied, 126 Wn.2d 1002 (1995).

(1) Motive to Lie

Pipes suggests that A.D. "likely . . . wanted to please her mother" by fabricating the allegations of abuse. Pipes suggests As.D's cool relationship with him and the lengthy periods that A.D. spent with her grandparents were the motivating factors. Neither suggestion is persuasive or supported by the record.

As.D testified that before A.D.'s disclosure, she had had a "cordial relationship" with Pipes when she lived with him. At the time of A.D.'s disclosure, As.D was allowing both of her children to spend most weekday nights with her mother and stepfather while she commuted to work. Nothing in the record suggests that A.D. believed As.D disliked Pipes or had any other motive for fabricating claims of abuse.

(2) Declarant's Character

Pipes does not challenge the trial court's finding that A.D. was "considered a good kid" and that "her general character is for truthfulness." Rather, he asserts that her inconsistent accounts of the touching "suggest she has trouble relaying information truthfully." But the fact that some of A.D.'s statements were contradictory or inconsistent does not support an inference she had a reputation for not telling the truth. See State v. Lopez, 95 Wn. App. 842, 853, 980 P.2d 224 (1999).

(3) Whether More Than One Person Heard the Statements

With the exception of the forensic nurse examiner, A.D.'s statements were made to one person. A.D. was clearly reluctant or embarrassed to talk about the details of the incident and did not reveal all of the same details to all of the speakers. But her general descriptions of the nature of the touching and the rubbing and its effect on her were largely consistent. A.D.'s statements satisfied

this factor. See Lopez, 95 Wn. App. at 853 (similar statements to different people on different occasions satisfies this factor).

(4)  Spontaneity of the Statements

A.D. spontaneously asked to tell her mother something and then said she did not want Pipes to move in. With a little encouragement, A.D. then disclosed that when Pipes gave her "rubbies" at bedtime, he touched her "girl parts." Almost a year later, A.D. volunteered that Pipes had "licked her butt hole and she didn't think it tasted very good."

Pipes argues that the statements to the forensic nurse were not spontaneous because they assumed Pipes had touched her. But the visit began with the open-ended question about why A.D. was in the hospital. It was only after A.D. volunteered that she was there because Pipes had touched her "private part" that the nurse asked about the nature and location of the touching. The questioning was not leading or suggestive. A child's answers for purpose of this factor are spontaneous if the questions are not leading or suggestive. Young, 62 Wn. App. at 901.

The trial court found A.D.'s statements to Pornel "somewhat problematic" because they were both spontaneous and possibly "tainted." But A.D.'s disclosure that Pipes "put his fingers in her butt hole" was not in response to a leading or suggestive question. Pornel indicated to A.D. that she had also been abused but did not provide any details about the touching. Under these

circumstances, the trial court did not abuse its discretion in concluding that this factor favored admission.

## 5. Timing of the Statement and the Relationship Between the Declarant and the Witness

Pipes contends that nothing about the timing of A.D.'s statements supports their reliability. He also claims that statements to authority figures or law enforcement personnel "[do] not favor reliability." Pipes provides no citation to authority or meaningful legal argument to support these conclusory allegations.

As the trial court noted, A.D. likely made her initial statements shortly after the touching occurred. The fact that the statements were made to a close family member and family friend or occurred "in a trusting or clinical atmosphere" likely enhances the reliability of the statements. See State v. Kennealy, 151 Wn. App. 861, 884, 214 P.3d 200 (2009), review denied, 168 Wn.2d 1012 (2010); see also State v. Lopez, 95 Wn. App. at 853 (presence of professionals investigating child abuse "enhances the reliability of the statements").

## 6. Whether the Statements Contain Any Express Assertion About Past Facts/ 7. Whether Cross-Examination Could Show the Declarant's Lack of Knowledge

A.D.'s statements contained express assertions about past facts, and she was subject to cross-examination at trial. But Washington courts have found that these two factors are of minimal relevance when determining the reliability of child hearsay. See State v. Lopez, 95 Wn. App. at 852.

8. Possibility of Faulty Recollection

A.D. gave generally consistent accounts of the touching to multiple witnesses. The trial court could reasonably conclude that when viewed in context, A.D.'s expressed lack of memory was a reluctance to talk about the touching, not a faulty memory. The trial court did not abuse its discretion in finding that this factor weighed in favor of reliability.

9. Circumstances Surrounding the Statements

Although A.D. supplied only a few details about the touching, she clearly described the general location and nature of the incident. Nothing in the circumstances surrounding the statements suggests that A.D. misrepresented Pipes' involvement. See generally Borland, 57 Wn. App. at 11 (concerns of the 8th and 9th Ryan factors are addressed in the first five factors).

The trial court did not abuse its discretion in concluding that the Ryan factors supported admission of the child hearsay statements.

Exclusion of Prior Abuse

Pipes contends the trial court violated his right to present a defense when it excluded evidence of a past allegation that another child had sexually abused A.D. Evidence of a prior act of sexual abuse against a young child victim may be admissible "to rebut the inference they would not know about such sexual acts unless they had experienced them with the defendant." State v. Carver, 37 Wn. App. 122, 124, 678 P.2d 842, review denied, 101 Wn.2d 1019 (1984). In Carver,

the defendant was charged with indecent liberties and statutory rape of his two young stepdaughters, including an act of anal intercourse. On appeal, the court held that evidence of similar sexual abuse by another person was admissible to rebut the inference that the two young girls were conversant with such acts "only because [the] defendant was guilty as charged." Carver, 37 Wn. App. at 124. The court concluded that the relevance of the evidence was not outweighed by the danger of unfair prejudice. When assessing the relevance of such evidence, however, the trial court must also consider the potential prejudice to both the trial process and the child victim. See State v. Kilgore, 107 Wn. App. 160, 180-81, 26 P.3d 308 (2001), aff'd on other grounds, 147 Wn.2d 288, 53 P.3d 974 (2002).

Here, our review is hampered because the record contains no meaningful evidence or offer of proof about the specific nature of the alleged abuse or the surrounding circumstances. Defense counsel identified only allegations of prior abuse involving the daughter of a different relative. The deputy prosecutor referred only to "prior sexual conduct having to do with H.B."

A.D.'s statements about the rubbing and touching used relatively plain language that was arguably age appropriate and did not include particularly explicit or graphic descriptions. See Kilgore, 107 Wn. App. at 180. The evidence did not suggest that A.D. had a motive to lie about Pipes, much less a motive to lie that was related to the alleged prior abuse. See Kilgore, 107 Wn. App. at 181. As indicated, the record provides no evidence of the nature of the alleged prior