IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | No. 78153-7-I |
| Respondent, | DIVISION ONE |
| v. | UNPUBLISHED OPINION |
| FRANCISCO CUAHUTEMOC VAZQUEZ, | FILED: November 12, 2019 |
| Appellant. | |

SMITH, J. — Francisco Vazquez was convicted of attempting to rob two drug dealers when he was 17 years old. He contends he is entitled to a new trial because he was denied his right to present a defense when the court limited his cross-examination of two State witnesses and because the prosecutor improperly bolstered a witness's credibility. He also contends the trial court failed to adequately consider his youth as a mitigating factor at sentencing. We affirm.

## FACTS

This case involves a drug transaction on March 13, 2017, between four men that ended with the shooting death of one of the participants. Dustin Bradshaw and Brian Wingender were childhood friends. Both occasionally sold drugs. An acquaintance of Bradshaw's, John Proctor, arranged for Bradshaw to sell two pounds of marijuana to a friend of Proctor's. Bradshaw did not know the identity of the buyer, but Proctor gave him a phone number and a name that was "something like a Mel or something like that."

Bradshaw contacted the buyer and received instructions to meet on a residential street in Everett. He and Wingender left Kenmore around midnight. Both men had concealed pistol licenses and were carrying firearms. Wingender had a duffel bag containing the marijuana. Bradshaw also had 199 pills of Xanax in the trunk.

Bradshaw and Wingender arrived at the meeting location and waited in the car for about five to ten minutes. They saw two men approach the car and then quickly walk away. The men came back, walked up to the car, and asked Bradshaw and Wingender if they had heard sirens or seen flashing lights. Confused and unnerved by the encounter, Wingender told Bradshaw to drive away.

Bradshaw contacted the buyer and was directed to a church parking lot. After a short time, the same two men as before approached the car. One of the men, later identified as Vazquez, grabbed Bradshaw and tried to pull him out of the car. The other man, who was Vazquez's friend John Muhlstein, pulled out a gun and got into the backseat. Muhlstein began screaming at Bradshaw and Wingender to "give him everything [they] had" or he would "blow [their] brains out." He hit Wingender in the head with the gun and began punching him.

Wingender grabbed the duffel bag, jumped out of the car, and ran. He looked back and saw Muhlstein pursuing him. Muhlstein was still holding the gun and yelling that he would shoot if Wingender did not stop. Wingender reached into his waistband and pulled out his own gun. He looked over his shoulder and pulled the trigger. He heard Muhlstein cry out and saw him veer into a yard.

2

Wingender continued to run through the neighborhood, trying to get back to Bradshaw and the car. He heard footsteps and saw Vazquez running full-speed towards him with something in his hand. Believing it was a gun, Wingender twice yelled for Vazquez to stop. When Vazquez continued to run towards him, Wingender raised his gun and shot twice at Vazquez. Vazquez fell to the ground.

Nearby police officers heard the gunshots and responded in less than a minute. They found Bradshaw sitting inside the car and Wingender standing by the front passenger door, with the duffel bag and his gun at his feet. The officers arrested both Wingender and Bradshaw. Wingender's head was bleeding from where Muhlstein hit him with the gun.

A few minutes later, Vazquez approached the officers on foot, saying that he had been shot. He had bullet wounds in his abdomen and shoulder. Officers later discovered Muhlstein's body in a nearby yard.

In a search of Vazquez's cell phone, officers found several messages between Vazquez and a contact named "Tae" shortly before the drug deal was to take place. At 9:35 p.m., Vazquez received a text from "Tae" stating, "What's good." The subsequent messages between Vazquez's phone and Tae's phone reveal a plan to rob Bradshaw and Wingender. For example, when Vazquez told Tae that he was at the meeting location, Tae responded, "Ok be ready and think before you do don't do nothing we can't go back from get it and go." Vazquez asked, "Okay how many people is there and who is it." Tae responded, "Should

be one or 2 and it's this white boys plug[1] so idk really what or who he is . . . Just play it off if it looks like y'all can't hit it just game him like you can get better for cheaper." At 11:47 p.m., Tae sent a message to Vazquez stating, "Be ready, and . . . think before you do don't do nothing we can't go back from. Get it and go." At 11:59 p.m., Tae sent another message stating, "Don't use that thang if you don't need to real talk." Vazquez agreed, stating, "Okay G where they at." At around 12:30 a.m., Tae sent Vazquez more instructions about the planned robbery.

> The nigga is on the way it's just a white boy he has bars on him too I guess he said y'all can try them try and get a roll or 3 out of him just talk business as if you were me feel me keep him going.
> …
>
> But if he has bars he's riding dirty so if y'all just jump on him with no whammy it's easy money at least put it in a bag or sum I'm telling you than Niggas can't get caught up at all.[2]

Vazquez texted, "Okay G" and "Say no more."

Vazquez testified that he and Muhlstein planned to buy an ounce of marijuana from Bradshaw and Wingender. He testified that he and Muhlstein each brought a hundred dollars to buy the marijuana. However, no money was found on either Vazquez or Muhlstein. Vazquez admitted to knowing Tae but denied knowing that Muhlstein planned to rob Bradshaw and Wingender. He claimed that Muhlstein borrowed his phone several times that evening and must have used it to contact Tae and set up the robbery.

---

[1] A "plug" is "a connection usually for a drug transaction."

[2] The investigating detective testified that "bars" is slang for Xanax. He explained that "riding dirty" means "that they are doing something illegal. If they were to get stopped by the police, then they would be potentially charged with a crime." He testified that one meaning of the word "whammy" is "firearm."

4

A jury convicted Vazquez as charged. Vazquez appeals.

DISCUSSION

*Testimony Regarding Plea Agreements*

Vazquez contends that the trial court violated his right to present a defense when it limited his ability to cross-examine Bradshaw and Wingender regarding any benefits they received in exchange for their testimony. The record shows that the court did not place any such limitations on Vazquez and he was not deprived of his right to present a defense.

The State charged both Bradshaw and Wingender with crimes arising from their conduct that night. At the time of Vazquez's trial, Bradshaw had pleaded guilty to possession of marijuana with intent to deliver. He had not yet been sentenced, but faced a standard sentencing range of between zero and six months. Wingender had been charged with possession of marijuana with intent to deliver, with a firearm enhancement. He was awaiting trial and faced a standard range sentence of 60 months.

The State moved to prohibit any reference to the firearm enhancement that Wingender potentially faced, arguing "that is the very enhancement that Mr. Vasquez is charged with, and it would be sort of a transparent way of letting the jury know what the punishment is that Mr. Vasquez is facing in this case." Defense counsel argued that Wingender and Bradshaw were "given sweetheart deals" to testify and that it was "appropriate for the jury to know what the benefit of the bargain is. That includes what they're avoiding in terms of being charged,

5

the amount of time they're avoiding having to serve . . . I think it is appropriate for the jurors to know that in terms of their testimony what they're getting."

The court prohibited defense counsel from specifically asking Wingender and Bradshaw about any firearm enhancements they were charged with. But the court otherwise allowed questioning about the potential sentence they faced and any benefits they were provided in exchange for their testimony.

> Well, you can reference that you're charged with this offense, but don't reference the firearm enhancement, the jurors don't need to know about that. And then you can reference if you're convicted with what you're charged with, your standard sentencing range . . . I'll permit that, but I don't know how you're going to infer or raise the issue that somehow they received a quote, unquote, sweetheart deal when it sounds like this is the way the cases were charged initially.
> ...
>
> [Y]ou can ask them if as a result of his agreeing to testify in this case whether or not he received any benefit from an offer from the State. But the problem is, if he says no, I think you're stuck with that. I don't see how you can follow-up, but I will allow that question.

Bradshaw testified that he had been charged with possession with intent to deliver marijuana. He admitted that he had agreed to testify as part of his guilty plea and that he knew he "could potentially be facing more serious charges" if he did not testify truthfully.

The Sixth Amendment to the United States Constitution guarantees a criminal defendant "a meaningful opportunity to present a complete defense." Holmes v. South Carolina, 547 U.S. 319, 324, 126 S. Ct. 1727, 164 L. Ed. 2d 503 (2006). Where the trial court excludes relevant defense evidence, we review de

novo whether the exclusion violates the defendant's constitutional right to present a defense. State v. Clark, 187 Wn.2d 641, 648-49, 389 P.3d 462 (2017).

Here, the trial court did not preclude Vazquez from asking either Wingender or Bradshaw about the benefits they may have received for testifying. But there was no evidence that Wingender had reached any agreement with the State in exchange for his testimony. Nor was there any evidence that the State agreed to reduce or dismiss charges against Bradshaw for his cooperation. Although Vazquez argues that Bradshaw "risked prosecution for felony murder" and "faced an additional 60 months of hard time" due to the use of a firearm, his claim that the State chose not to charge Bradshaw with these crimes in exchange for Bradshaw's testimony is not supported by the evidence. Vazquez fails to show that the trial court erroneously excluded relevant evidence critical to his defense.

Vazquez also argues that the limits on cross-examination violated his rights of confrontation. The confrontation clause of the Sixth Amendment guarantees the right to impeach prosecution witnesses with evidence of bias or motive to testify. State v. Mohamed, 187 Wn. App. 630, 649, 350 P.3d 671 (2015). But the right to cross-examine adverse witnesses is not absolute; the trial court "has discretion to control the scope of cross-examination and may reject lines of questions that only remotely tend to show bias or prejudice, or where the evidence is vague or merely speculative or argumentative." State v. Kilgore, 107 Wn. App. 160, 185, 26 P.3d 308 (2001). We review alleged

7

violations of the confrontation clause de novo. State v. Koslowski, 166 Wn.2d 409, 417, 209 P.3d 479 (2009).

Here, testimony regarding the length of a possible firearm enhancement would not have been relevant to bias or motive to testify. There was no evidence that the State had ever charged Bradshaw with a firearm enhancement. Thus, avoiding a firearm enhancement was not a motive for Bradshaw to testify. Nor was there any evidence that Wingender was receiving a benefit in exchange for his testimony. Vazquez fails to establish a confrontation clause violation.

*Prosecutorial Misconduct*

Vazquez contends that the prosecutor committed misconduct by assuring the jury that Wingender had been charged with a crime for his conduct that night. He argues that this constituted improper vouching for Wingender's credibility.

During the State's rebuttal closing argument, the prosecutor argued that Bradshaw's and Wingender's version of events was credible because it was supported by the physical evidence, including the injuries and the bullet pattern. The prosecutor instructed the jury that its job was to focus on the charge of attempted robbery and not any crimes that Bradshaw and Wingender may have committed.

> PROSECUTOR: Now, make no mistake, I still want you to have that dividing line in your mind about what happened on Lombard is a whole other case. It's called State of Washington vs. Brian Wingender.
>
> DEFENSE COUNSEL: Objection, Your Honor.
>
> THE COURT: Sustained.

8

PROSECUTOR: And you need to concentrate on what happened in that alleyway.

DEFENSE COUNSEL: Your Honor.

THE COURT: Jurors will disregard the comment in relation to any other case aside from this one.

PROSECUTOR: So they're separate, right? They're entirely separate.

DEFENSE COUNSEL: And, Your Honor –

PROSECUTOR: The way that they are linked is that, yes, physical evidence from the Lombard side of the street does end up providing corroborative evidence that supports the credibility of the State's witnesses. Mr. Pavey, Mr. Bradshaw, Mr. Wingender. And that is the value of that evidence as far as this case. O.K. Now, the order of people through the breezeway, as far as this case is concerned –

DEFENSE COUNSEL: Your Honor, objection to repeated reference of this case, that case. It is not accurate.

THE COURT: Just focus on the facts of this case.

PROSECUTOR: I think I'm doing that.

THE COURT: Don't have to reference any other case or this case, we're only talking about the charge before this defendant.

PROSECUTOR: Yes. I agree.

Vazquez moved for a mistrial, which the trial court denied.[3]

"A claim of prosecutorial misconduct requires the defendant to show both that the prosecutor made improper statements and that those statements caused prejudice." State v. Lindsay, 180 Wn.2d 423, 440, 326 P.3d 125 (2014). "If the defendant objected at trial, the defendant must show that the prosecutor's misconduct resulted in prejudice that had a substantial likelihood of affecting the

---

[3] Vazquez does not challenge the court's denial of the mistrial.

jury's verdict." State v. Emery, 174 Wn.2d 741, 760, 278 P.3d 653 (2012) (citing State v. Anderson, 153 Wn. App. 417, 427, 220 P.3d 1273 (2009)). In evaluating a claim of prosecutorial misconduct, we review a prosecutor's remarks "in the context of the total argument, the issues in the case, the evidence addressed in the argument, and the instructions given to the jury." State v. Brown, 132 Wn.2d 529, 561, 940 P.2d 546 (1997).

It is improper for the prosecution to vouch for the credibility of a government witness. State v. Ish, 170 Wn.2d 189, 196, 241 P.3d 389 (2010). Stating that information not presented to the jury supports the witness's testimony is a form of vouching. Ish, 170 Wn.2d at 196.

Here, the prosecutor's brief remark did not constitute vouching for Wingender's credibility. Rather, it served to remind the jury that their role was limited to determining whether Vazquez had committed a crime. To the extent that the prosecutor referred to facts not in evidence, the reference was improper. See State v. Ray, 116 Wn.2d 531, 550, 806 P.2d 1220 (1991) (a prosecutor may not make statements that are unsupported by the record). But Vazquez fails to show that the remarks were so prejudicial that they had a substantial likelihood of affecting the jury's verdict. Defense counsel had repeatedly informed the jury that Bradshaw had been charged with a separate crime for his actions that night. It was not unreasonable for the jury to assume that the State had also charged Wingender. And it is difficult to discern how being charged with a crime would have strengthened Wingender's credibility in the eyes of the jury. Vazquez has not established reversible error.

10

*Sentencing*

Vazquez committed the crime when he was a few weeks shy of his 18th birthday. He argues that the trial court abused its discretion when it determined, despite Vazquez's youth, that it was required to impose a term of 36 months for the firearm enhancement consecutive to the base sentence. Citing State v. Houston-Sconiers, 188 Wn.2d 1, 391 P.3d 409 (2017), he contends that he is entitled to resentencing because the court misunderstood the extent of its discretion.

A court "may impose a sentence outside the standard sentence range for an offense if it finds, considering the purpose of [the SRA], that there are substantial and compelling reasons justifying an exceptional sentence." RCW 9.94A.535. "When a trial court is called on to make a discretionary sentencing decision, the court must meaningfully consider the request in accordance with the applicable law." State v. McFarland, 189 Wn. 2d 47, 56, 399 P.3d 1106 (2017) (citing State v. Grayson, 154 Wn.2d 333, 342, 111 P.3d 1183 (2005)). "A discretionary sentence within the standard range is reviewable in 'circumstances where the court has refused to exercise discretion at all or has relied on an impermissible basis for refusing to impose an exceptional sentence below the standard range.'" McFarland, 189 Wn.2d at 56 (quoting State v. McGill, 112 Wn. App. 95, 100, 47 P.3d 173 (2002)). A trial court relies on an impermissible basis when it "operates under the 'mistaken belief that it did not have the discretion to impose a mitigated exceptional sentence for which [a defendant] may have been

11

eligible.'" McFarland, 189 Wn.2d at 56 (quoting In re Pers. Restraint of Mulholland, 161 Wn.2d 322, 333, 166 P.3d 677 (2007)).

Based on his offender score, Vazquez faced a standard sentencing range of between 30.75 and 40.5 months. Immediately prior to sentencing, defense counsel provided the court with a sentencing memorandum arguing that Vazquez's youth constituted a mitigating factor justifying an exceptional sentence below the standard range, based on State v. O'Dell, 183 Wn.2d 680, 358 P.3d 359 (2015). Vazquez argued that he had only an eighth grade education, had spent most of his life in juvenile detention, and was homeless at the time of the crime. He proposed that the trial court impose a sentence of 12 months on the attempted robbery conviction and 36 months for the firearm enhancement, for a total sentence of 48 months.

The court stated that it had found the facts of the case "more troubling and more difficult for me than any case I've ever had." The court stated it would impose an exceptional sentence downward if the law and the facts supported it. Otherwise, the court explained, it would impose a low-end standard range sentence.

> I can tell you this. Based on your arguments the likelihood is if I don't find a basis legally for the exceptional sentence, I probably would sentence your client to the low end of the standard range because of the issues that you've raised.

But after continuing the sentencing hearing approximately two weeks in order to review Vazquez's sentencing memorandum, the court determined that Vazquez's youth did not justify an exceptional sentence below the standard

range. The court noted that "age is not a per se mitigating factor automatically entitling every youthful defendant to an exceptional sentence." It compared Vazquez to the defendant in O'Dell, who was described by family and friends as immature for his age and whose bedroom still contained toys, stuffed animals, and posters of cartoon characters. In contrast, the court found, Vazquez's actions were not the result of youthful impulsivity, but were deliberate and intentional.

> Mr. Vazquez at the last hearing was articulate and was thoughtful. He did not appear to, and I'll just say that in quotes as it was referenced in relation to [O'Dell], only to be a kid, similar to that defendant in the [O'Dell] case.
>
> In this case, the actions were premeditated, planned and thought out ahead of time. They were not impulsive, as these cases indicate in relation to taking youth into consideration.
>
> Additionally, there were opportunities to not follow through with the plan, especially when the first contact referenced to the police being nearby, and the plan was never abandoned.
>
> The primary factual basis for the request for the exceptional sentence below the standard range in this case is really the age of the defendant, which alone is not sufficient.

The court also found that Vazquez's difficult life circumstances also did not merit an exceptional sentence.

> While it's true the defendant had had a lack of education, and homelessness, those are factors that are not attributable necessarily to youth as many adult offenders who appear before the court follow the same circumstances.
>
> While it's true that running away is often the behavior of a child, the Court does not find that this factor alone together with the age are appropriate for an exceptional sentence below the standard range in this case.

However, the court disagreed with the State's request for a high-end standard range sentence, finding that it was excessive considering Vazquez's youth. The court imposed 30.75 months on the attempted robbery conviction, the lowest possible sentence within the standard range.

As for the deadly weapon enhancement, the court imposed a term of 36 months, as requested by the parties. The court stated that it was required to impose the enhancement once the jury found by special verdict that Vazquez was armed with a deadly weapon.

> While it's true, Mr. Vazquez, that you did not possess a firearm, the jury concluded that the evidence established that as required by the law, and there is a basis for the enhancement. While that may seem unfair to you, *under these circumstances the law is clear and there is nothing I can do other than impose what I've imposed in relation to that.*

(Emphasis added).

In Houston-Sconiers, the defendants were 16 and 17 at the time they used a gun to rob several other juveniles of their Halloween candy and cell phones. They were convicted as adults of multiple offenses including several mandatory firearm enhancements. The trial court expressed frustration that it was required by RCW 9.94A.533(3)(e) to run the firearm enhancements consecutively, resulting in disproportionately long sentences. The Washington Supreme Court held that, when sentencing a juvenile in adult court, a trial court has absolute discretion to depart from both the standard sentencing ranges and mandatory sentence enhancements prescribed by the Sentencing Reform Act of 1981 (SRA), chapter 9.94A RCW. A court must consider circumstances related to the

14

defendant's youth, including age and its "hallmark features," such as the juvenile's "immaturity, impetuosity, and failure to appreciate risks and consequences." Houston-Sconiers, 188 Wn.2d at 23 (quoting Miller v. Alabama, 567 U.S. 460, 477, 132 S. Ct. 2455, 2468, 183 L. Ed. 2d 407 (2012)). It must also consider factors like "the nature of the juvenile's surrounding environment and family circumstances," "the extent of the juvenile's participation in the crime," and "any factors suggesting that the child might be successfully rehabilitated." Houston-Sconiers, 188 Wn.2d at 23 (citing Miller, 567 U.S. at 477). Because the trial court in Houston-Sconiers did not recognize that it possessed this discretion, the court remanded for resentencing.

Here, no one cited to nor discussed Houston-Sconiers, despite the fact that the decision was published over a year before the sentencing hearing. Nonetheless, the record does not show that the trial court misunderstood the extent of its discretion. The court recognized it had the opportunity to impose an exceptional sentence downward, and it explicitly chose not to do so. While the court told Vazquez "the law is clear and there is nothing I can do other than impose what I've imposed," this does not appear to signal a mistaken belief that the court lacked discretion to depart from the enhancement. Instead, the court was explaining that the deadly weapon enhancement applied to Vazquez based on the theory of accomplice liability even though Vazquez did not have a gun.

But even assuming the court was unaware of its discretion, the record does not suggest the court would have departed from the enhancement had it known it could do so. The court fully considered Vazquez's request to consider

his youth as a mitigating factor, and determined that the facts did not warrant an exceptional sentence below the standard range.

Vazquez also challenges the manner in which the court considered his youth as a mitigating factor. He argues that the court should have placed greater weight on his homelessness and lack of formal education. In doing so, he compares his case to State v. Bassett, 192 Wn. 2d 67, 72, 428 P.3d 343 (2018). In Bassett, the 16-year-old defendant had been kicked out of his parents' home and was living with a friend; he went back to his home and murdered his parents and brother. He was sentenced to three consecutive sentences of life without the possibility of parole. When he was resentenced pursuant to RCW 10.95.030, the court rejected his request for leniency and reimposed the original sentence. But Bassett provides no guidance here. The court in Bassett held that sentencing juveniles to life without the possibility of parole is categorically unconstitutional; it did not hold that the court abused its discretion in failing to consider the defendant's homelessness and lack of insight as mitigating factors.

Here, the trial court fully considered the factors identified in Houston-Sconiers, including Vazquez's level of maturity, his appreciation of the risks and consequences, his participation in the crime, and rehabilitative factors such as family support and career goals. The court found that these factors made the State's recommendation of a high-end standard range sentence inappropriate. But the court disagreed that these factors merited an exceptional sentence below the standard range. The court properly exercised its discretion, and thus its decision declining to impose an exceptional sentence is not reviewable.

16

Affirmed.

_____
Smith, J.

WE CONCUR:

_____        _____
Leach, J.                              Schindler, J.