**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

| | |
|---|---|
| THE STATE OF WASHINGTON, <br><br> Respondent, <br><br> v. <br><br> IAN EUGENE FLAHERTY, <br><br> Appellant. | No. 83507-6-I <br><br> DIVISION ONE <br><br> UNPUBLISHED OPINION |

MANN, J. — Ian Flaherty was found guilty of murder in the first degree with deliberate cruelty for the murder of his housemate. While Flaherty ultimately admitted to the murder, he argued that it was not premediated or intentional because his actions resulted from his autism spectrum disorder and his impulsive response to the victim unexpectedly biting his fingers.

Flaherty argues on appeal that the trial court erred in admitting evidence of his prior engagement in BDSM[1] activities because it was not relevant and was improper propensity evidence, and the trial court failed to give a limiting instruction. Alternatively,

---

[1] BDSM stands for "bondage, discipline, sadism, masochism" and is understood as "sexual activity involving such practices as the use of physical restraints, the granting and relinquishing of control, and the infliction of pain." MERRIAM-WEBSTER ONLINE DICTIONARY, https://www.merriam-webster.com/dictionary/BDSM (last visited Feb. 16, 2023).

Flaherty contends his defense counsel was ineffective in failing to inform the trial court that his sensitivity to touch was only triggered by unexpected touch unlike the expected touch during BDSM.

We affirm.

I.

A.

In mid-August 2017, Flaherty moved from Wenatchee to Seattle and sublet a room in Lalita Byrnes's apartment. On March 11, 2018, Byrnes asked, and Flaherty agreed, to sign a note committing to move out within 30 days. The next day Byrnes's friend found her dead in her bedroom. Byrnes suffered 96 stab wounds to her head, face, neck, chest, back, and several defensive wounds to her hands and arms. She also had blunt force injuries and signs of strangulation. The medical examiner concluded that most of Byrnes's injuries were inflicted while she was alive.

Flaherty's DNA[2] was found under Byrnes's fingernails and on the handle of the murder weapon. Flaherty denied his involvement in Byrnes's death for over a year and a half, telling a complex story that included a fictitious third person. Flaherty eventually confessed to killing Byrnes, but said that he was instructed to do so by voices in his head. He claimed that he went to Byrnes's room intending to scare her into giving back the note in which he agreed to move out of the apartment. Flaherty claimed he took a kitchen knife and woke Byrnes up by covering her mouth with his hand. Flaherty claimed that Byrnes struggled and bit his fingers. He told the defense forensic

---

[2] Deoxyribonucleic acid.

psychologist, Dr. Delton Young, that he stabbed Byrnes's neck and grabbed her throat to stop her from screaming. He failed to explain the other 90-plus wounds and told the defense neuropsychologist, Dr. Marnee Milner, that he had no recollection of the killing.

Flaherty was arrested in 2018 and charged with murder in the first degree for the premeditated murder of Byrnes while armed with a deadly weapon. The information was later amended to allege that he committed the crime with deliberate cruelty.

B.

Flaherty was referred for evaluation by Dr. Young to determine whether he suffered a mental health disorder, and if so, whether that disorder may have played a role in his judgment and actions at the time of the murder. Dr. Young explained that Flaherty had experienced "a wide range of severe, even disabling psychiatric symptoms over the years. These have included, most prominently, extreme hypersensitivities and reactivity beginning in preschool years; considerable impaired emotional modulation and control wherein he would reactively lash out when frustrated." Dr. Young diagnosed Flaherty with level 1 autism spectrum disorder (ASD). Dr. Young explained that at the time of the murder:

> In his deteriorated mental state of severe depression, anxiety, and auditory hallucinations, Mr. Flaherty was at the mercy of a lifelong deficiency in emotional constraint: The normal moment of cognitive mediation between strong emotion (pain, anger) and violent action was missing. Strong emotions at that moment drove violent actions without thought, planning or judgment. This was a reflexive reaction to pain in his fingers and the voice, made possible by a long-standing impairment in emotional control.

Flaherty also underwent a neuropsychological evaluation by Dr. Milner. Dr. Milner evaluated Flaherty on the "limited issue of premeditation and impulsivity." Like Dr. Young, Dr. Milner concluded:

> Mr. Flaherty has and continues to exhibit increased sensitivity to changes in routine or structure and increased sensitivities to unexpected noises, verbal stimuli and unexpected physical touch. More specifically, Mr. Flaherty has difficulty responding favorably when touched unexpectedly by others and he has felt increasingly severe levels of pain from such touch.

Dr. Milner explained that at the time of the murder:

> It is quite possible in accord with Mr. Flaherty's chronic rigidity of thinking and inability to shift focus, his chronic impulsivity and innate sensory response (i.e. defense) system (all of which is heightened when emotionally charged or triggered), that when Ms. Byrnes bit Mr. Flaherty's fingers, he reacted impulsively and defensively to the perceived severity of the sensory insult and this triggered the killing in that moment without forethought.

In their expert reports, both Dr. Young and Dr. Milner discussed Flaherty's involvement in BDSM activities. According to Dr. Young, Flaherty explained that he had begun participating in BDSM while living in Olympia and then later Seattle. Flaherty admitted during his evaluation by Dr. Young to engaging in BDSM with prior girlfriends. He stated, "I enjoyed the biting . . . [w]e would bite and flog and sometimes use food items. I was fine with it." For several months while he was living in Seattle he engaged in BDSM meet-ups where there were between 7 and 30 people engaging in various sex acts. Flaherty also stated he attended about 12 BDSM meet-ups from January to February 2018, but that he mostly observed. According to Dr. Milner's report, "While living in Olympia and Seattle, Mr. Flaherty participated in BDSM . . . events."

C.

Expecting that the State would seek to cross-examine Dr. Milner and Dr. Young on Flaherty's BDSM activities, Flaherty moved pretrial to exclude evidence of his participation in BDSM. Flaherty argued that there was no indication that the stabbing of Byrnes was sexually motivated and that his participation in BDSM was irrelevant and more prejudicial than probative. The State objected, arguing that it was relevant to Flaherty's claim that he stabbed Byrnes only after she bit his hand because of his "overly sensitive" response to touch.

The trial court denied the motion to exclude, finding the evidence to be highly relevant to the credibility of the expert opinions and to rebut the defense claim that he "reacted to touch." The court also determined "there's no unfair prejudice to Mr. Flaherty and the probative value far outweighs any prejudice." In its written order on pretrial motions, the court also explained:

> Given the defense claim[s], and the defense experts anticipated testimony regarding Mr. Flaherty's alleged sensory disorder and autism disorder, attendance at BDSM events close in time is relevant under 401 and 402 (Flaherty's defense experts will opine that Flaherty reacted to touch). This testimony is also admissible as it is relevant because it goes to the weight and credibility of the expert opinion. The probative value of this testimony far outweighs any prejudice, and the Court finds no unfair prejudice.

D.

At trial, Flaherty accepted responsibility for murdering Byrnes, but argued that the murder was not premeditated and did not involve deliberate cruelty. Instead, he argued that the murder resulted from an impulsive response to Byrnes unexpectedly biting his hand. As defense counsel explained, "when Ms. Byrnes bit down, it was like a match was thrown at Mr. Flaherty, and he exploded, he became instantly enraged, unable to

control his reflexive reaction, and he strangled Ms. Byrnes, and he stabbed her nearly 100 times, killing her."

The defense was the first to introduce evidence of Flaherty's engagement in BDSM during the direct examination of Dr. Young:

Q. You also, in your report, mention that he participated in his BDSM events.

A. Right.

Q. Can you talk—do you have an opinion about whether that participation—what does that say about his tactile defensiveness?

A. I actually don't know what to make of it. He explained that he attended a lot of BDSM events on his own and with a friend in December, January, February, February 20—

Q. '18?

A. —18. He said he was an observer and didn't participate. On the other hand, he also explained that earlier he had engaged in BDSM sexual contact with a girlfriend.

Q. But in the winter of '18, it was more observing?

A. Yes. That was his account, yes.

Q. Would you expect to see a difference between expected touch and unexpected touch in the context of BDSM events?

A. Well, in general, unexpected touch is more likely to be problematic. That's about all I can say about it.

During cross-examination by the State, Dr. Young agreed that Flaherty told him that his encounters included biting and flogging, and that he was fine with it. And despite knowing this, Dr. Young did not ask Flaherty, or his girlfriends about the details of the activities or how they related to Flaherty's sensory disorder. Dr. Young instead assumed that Flaherty was more sensitive when he was not expecting to be touched.

Similarly, during the State's cross-examination of Dr. Milner, she admitted that she did not ask Flaherty how his participation in BDSM played into his sensitivity to touch. Instead, she assumed based on literature, that Flaherty only reacted to unexpected touch.

The jury found Flaherty guilty as charged. Flaherty was sentenced to 584 months of confinement.

Flaherty appeals.

## II.

Flaherty argues that the trial court erred in admitting evidence of his engagement in BDSM activities because it was not relevant, was improper propensity evidence, and the court failed to give a limiting instruction. We review the trial court's evidentiary rulings for abuse of discretion. State v. Powell, 126 Wn.2d 244, 258, 893 P.2d 615 (1995). A trial court abuses its discretion only when its ruling was based on untenable grounds or untenable reasons. Powell, 126 Wn.2d at 258.

## A.

Flaherty argues first that the trial court erred in denying his motion in limine to exclude testimony of Flaherty's engagement in BDSM under ER 401, 402, and 403 because it was irrelevant to the issue of unexpected touch and otherwise unfairly prejudicial. We disagree.

Evidence must be relevant to be admissible. ER 402. Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." ER 401. Relevant evidence may be excluded "if its probative

value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." ER 403.

This is not a case about whether Flaherty was motivated to commit murder because of his participation in BDSM activities. Instead, the question is whether Flaherty's participation in BDSM activities was relevant to the credibility of the defense experts' testimony. This is particularly true as the defense experts failed to ask Flaherty details about his participation in BDSM and his response to touch. Because these are unknown—most critically any exploration of the interplay between Flaherty's sensory disorder and his particular approach to BDSM practices--the evidence is highly relevant as to impeachment of Flaherty's expert witnesses.

Again, evidence is relevant if it has "any tendency" to make a determinative fact any more or less probable. This evidence is relevant because it tends to make the existence of a material fact, that Flaherty's actions were motivated by an unexpected bite, less probable. State v. Wilson, 60 Wn. App. 887, 889 n.3, 808 P.2d 754 (1991). Thus, the court did not err in concluding that the evidence of Flaherty's participation in BDSM activities was relevant under ER 401.

The State specifically argues that the evidence was admissible under ER 611(b) and ER 705. We agree. ER 611(b) allows cross-examination of any witness into matters that affect the witness's credibility.[3] State v. Russell, 125 Wn.2d 24, 92, 882 P.2d 747 (1994). Cross-examination going to credibility is considered a matter of right,

---

[3] ER 611(b) states, "Cross examination should be limited to the subject matter of the direct examination and matters affecting the credibility of the witness." (Emphasis added).

but the scope may be limited within the discretion of the trial court.  State v. Roberts, 25 Wn. App. 830, 834, 611 P.2d 1297 (1980).  The court may limit the scope of cross-examination where the evidence only remotely shows bias or prejudice of the witness, is vague, or is merely argumentative and speculative.  State v. Jones, 67 Wn.2d 506, 512, 408 P.2d 247 (1965).  An opposing party may cross-examine an opponent's expert witness by inquiring into the facts in which the expert relied on.  ER 705.

The State sought to question Flaherty's expert witnesses on facts known to them but not adequately explored or considered.  Flaherty's participation in BDSM was a proper subject for cross-examination because it affected the credibility of the defense experts' opinions.  The expert witnesses knew that Flaherty engaged in BDSM while contending that Flaherty's rage was incited by Byrnes unexpectedly biting him.  On cross-examination, the State asked the experts how much they knew about Flaherty's history participating in BDSM, what they asked Flaherty, and how much that was relevant to his ASD.  The BDSM evidence was admissible under ER 611(b) and ER 705.[4]

## III.

Flaherty argues alternatively, that his trial counsel was ineffective because counsel failed to make clear to the court during pretrial motions that it was only <u>unexpected</u> touch that triggered a violent response.  We agree that counsel was deficient, but the argument fails because Flaherty cannot show prejudice.

---

[4] Flaherty also contends that the trial court erred in not properly evaluating the BDSM evidence under ER 404(b) as propensity evidence and for not giving a limiting instruction informing the jury of the limited purpose for its admission.  We share the trial court's concern over whether the evidence was propensity evidence under ER 404(b).  More importantly, because the evidence was admissible under ER 611(b) and ER 705 for impeachment purposes, we do not reach Flaherty's ER 404(b) arguments.

Criminal defendants are guaranteed the right to effective assistance of counsel. See U.S. CONST. amend. VI; WASH. CONST. art. I, § 22. Strickland v. Washington, 466 U.S. 668, 684-86, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). To establish ineffective assistance, Flaherty bears the burden to show (1) "defense counsel's conduct was deficient, i.e., that it fell below an objective standard of reasonableness," and (2) "the deficient performance resulted in prejudice, i.e., that there is a reasonable possibility that, but for the deficient conduct, the outcome of the proceeding would have differed." State v. Reichenbach, 153 Wn.2d 126, 130, 101 P.3d 80 (2004). Counsel's representation is not deficient if it "can be characterized as legitimate trial strategy or tactics." State v. Kyllo, 166 Wn.2d 856, 863, 215 P.3d 177 (2009). Failure to meet either prong of the ineffective assistance test is dispositive of a claim on appeal. State v. Sosa, 198 Wn. App. 176, 185, 393 P.3d 796 (2017).

We agree that Flaherty prevails on the first prong. While defense counsel moved to exclude evidence of Flaherty's participation in BDSM activities, counsel failed to address the critical difference between expected touch and unexpected touch which went to the core of his defense. Counsel argued only that BDSM activities were irrelevant because there was no evidence the murder was sexually motivated:

> Flaherty's participation in BDSM clubs did not inform Dr. Young or Dr. Milner's opinion and the State should be excluded from inquiring about it because the risk of unfair prejudice outweighs any probative value. There is no evidence that this charge is sexually motivated, and the State is not calling any expert or witness who can establish any relevance to Mr. Flaherty's sexual history.

Because the defense theory was that Flaherty reacted to Byrnes's unexpected bite of his fingers, it was deficient performance to fail to raise this with the trial court or otherwise educate the court about the nuance of the defense.

But Flaherty fails to show prejudice. Even if defense counsel had more zealously argued the difference between expected and unexpected touch, the evidence of BDSM activities would most likely still have come in on cross-examination. The State would have been able to use the evidence to explore the facts and assumptions underlying the expert testimony under ER 705. Moreover, even if the evidence of BDSM activities had been excluded, there was more than sufficient evidence to support the jury's conviction. Flaherty fails to effectively demonstrate that there is a reasonable probability of a different outcome.

IV.

In his statement of additional grounds, Flaherty argues that the prosecutor committed misconduct by violating rules of evidence, burden shifting, and inserting personal opinion. We disagree.

Improper arguments made by prosecutors may deprive the defendant of a fair trial. In re Pers. Restraint of Glasmann, 175 Wn.2d 696, 703-04, 286 P.3d 673 (2012). To prove prosecutorial misconduct, the defendant bears the burden of establishing that the prosecutor's conduct was improper and prejudicial. State v. Emery, 174 Wn.2d 741, 756, 278 P.3d 653 (2012). We review comments made in closing argument within "the context of the prosecutor's entire argument, the issues in the case, the evidence discussed in the argument, and the jury instructions." State v. Dhaliwal, 150 Wn.2d 559, 578, 79 P.3d 432 (2003).

-11-

To establish the first prong, the defendant must show that it is "clear and unmistakable" that counsel committed misconduct. State v. Sargent, 40 Wn. App. 340, 344, 698 P.2d 598 (1985). "A prosecutor acts improperly by seeking a conviction based upon emotion rather than reason." State v. Craven, 15 Wn. App. 2d 380, 385, 475 P.3d 1038 (2020). To establish the second prong, the defendant must show a "substantial likelihood the misconduct affected the jury's verdict." State v. Stenson, 132 Wn.2d 668, 718-19, 940 P.2d 1239 (1997). Jurors are presumed to follow the court's instructions. Emery, 174 Wn.2d at 766.

Flaherty moved for a mistrial because of the number of sustained objections during closing arguments. Flaherty argued that a curative instruction was insufficient to cure the prejudice. Flaherty noted "either five or six sustained objections, including inserting personal opinion, burden-shifting, et cetera." The court denied the motion, explaining that the court asked the jury to disregard the sustained objections, and that the jury is presumed to follow the court's instructions.

Flaherty fails to demonstrate clear and unmistakable misconduct. While the trial court sustained several objections during closing argument, Flaherty fails to explain why the curative instructions were insufficient. The jury is presumed to follow the court's orders. Emery, 174 Wn.2d at 766. Flaherty also fails to provide specific statements of misconduct, or explain the alleged misconduct other than the number of sustained objections.

Nor does Flaherty demonstrate prejudice. It is the defendant's burden to demonstrate a "substantial likelihood the misconduct affected the jury's verdict." Stenson, 132 Wn.2d at 718-19. Flaherty argues that the prosecutor inserted his

-12-

personal opinion, improperly burden shifted multiple times, and violated the rules of evidence. Because "this was done deliberately, in violation of the core tenant of a prosecuting attorney" there was prejudice. Flaherty fails to identify the resulting prejudice or provide evidence of specific misconduct. The court need not search the record to complete Flaherty's argument. In re Estate of Lint, 135 Wn.2d 518, 532, 957 P.2d 755 (1998).

Affirmed.

Mann, J.

WE CONCUR:

Hazelrigg, A.C.J.

Dwyer, C.J.